Per Curiam :*
Plaintiff seeks retirement pay allegedly due him because of disability extant at the time of his release from military service on May 27, I960.[1] Plaintiff describes his condition as psychosis or psychoneurosis. Either condition, if properly established by medical examination, qualifies under appropriate Air Force regulations as a disability sufficient to warrant retirement. Defendant claims that plaintiff was suffering from a character and personality disorder at the time of his release from active service. If defendant’s contention is sustained, plaintiff did not suffer from a disability sufficient to warrant retirement under applicable regulations.
During four periods of enlistment plaintiff accumulated 13 years and 11 days of active military service. From February 1956 to the date of his discharge, plaintiff served primarily as a munitions specialist. That position places considerable stress upon the individual performing its requirements.[2] Even though plaintiff was hospitalized for nervous disorders on numerous occasions during his military career, his character and efficiency ratings ranged from very good to excellent, and included the Good Conduct Medal with three loops.
*805 Because of the nervous condition plaintiff was hospitalized for a period of 9 days in August 1947. At the end of the hospitalization period a diagnosis of mild, chronic anxiety reaction was made.[3] He was again hospitalized in March 1952 for the illness and the resulting diagnosis was the same as that made during the initial hospitalization.
On several occasions during 1956 plaintiff suffered stomach and head pain which was attributed to nerves and for which medication was prescribed. In January 1958 plaintiff was described as “extremely nervous” when examined on an outpatient basis for stomach pains which were attributed to emotional upset.
On August 11,1958, the 7425th TJSAF Hospital located in Germany requested that plaintiff be given a psychiatric examination because he was extremely nervous, very apprehensive, tremulous, and had been hospitalized twice for nerves and had remained on medication as an outpatient for over 6 months. A provisional diagnosis of “Chronic Anxiety Reaction” was -made.
On August 29,1958, a consultation report diagnosed plaintiff’s illness as:
SghizophRENXo Reaction, paranoid type, chronic, moderate, manifested by difficulty in interpersonal relationships, restlessness and some anxiety.
Stress: minimal; Predisp: marked; Impairment: moderate.
LD: Undet.
Plaintiff was scheduled for admission to the hospital for further evaluation. His hospitalization from September 2 to 11,1958, resulted in a diagnosis as follows:
Emotional Instability Reaction, chronic, moderate, manifested by excitability, explosiveness, emotional liability, moderate anxiety and trends toward paranoid ideation.
Stress: minimal; Predisp: moderate; Impairment: moderate.
He was discharged to full duty on September 11,1958, with a month’s supply of Sparine 100 mg q.i.d.
*806 On January 26, 1960, the administrative officer of plaintiff’s unit requested, without specifying reasons, that plaintiff be given a psychiatric examination.[4] On February 12, 1960, an Air Force physician[5] authored a “Narrative Summary” (Standard Form 502) evaluating plaintiff’s mental status. He noted plaintiff was “extremely suspicious,” and taking into consideration previous diagnoses of plaintiff’s mental state “strongly recommended that he be removed immediately from any critical position.” The “Narrative Summary” was cursory, failing in many aspects to investigate areas usually covered as a matter of routine procedure by such a report.
After being provided legal counsel, plaintiff was officially notified on April 15,1960, of a contemplated discharge action against him under the provisions of Air Force Begulation (AFB) 39-16, §A, para. 4b, because of a “long Medical History of extreme anxiety, emotional instability and [because] it has been determined that you are unsuitable for further military service.” AFB 39-16 states, in pertinent part, as follows:
Enlisted Personnel
DISCHARGE FOR UNSUITABILITY
SECTION A-GENERAL
at at * * *
_ 4. Airmen Subject to Discharge Under This Begulation. An airman is subject to discharge for unsuitability when one or more of the conditions noted below exist. Unless otherwise indicated, discharge processing will be instituted under the procedures outlined in the Begulation.
$ $ * # $
*807 b. Character and Behavior Disorders. Character and behavior disorders, disorders of intelligence and transient personality disorders due to acute or special stress as defined in “Joint Armed Forces Nomenclature and Method of Recording Psychiatric Conditions — 1949”, (AFR 160-13).
SECTION B — PROCESSING BY INDIVIDUAL EVALUATIONS
j{í
8. Procedure.
*****
o. Action by Medical Officer. The medical officer will ascertain, from his examination and other medical records, whether any mental or physical disability exists which would warrant action under AFM 35-4. [6] He will record his findings and opinions on Standard Form 88, “Report of Medical Examination”.
*****
(2) If there is evidence of mental illness, a report of evaluation by a psychiatrist will be obtained. The medical officer will make an appointment for the airman at the nearest medical treatment facility having a psychiatrist. Referral for consultation will be on an outpatient status and only under unusual circumstances will the airman be hospitalized for psychiatric consultation required by this regulation. If the distance involved is great, the airman may be placed on temporary duty. The psychiatrist’s report will include a concise description of the essential points of the mental status of the airman. It will also state that the airman was or is (or both, as appropriate) sufficiently free from mental illness, defects, or derangement to be able both to distinguish right from wrong concerning the specific acts involved and to adhere to the right (see MCM, 1951, paragraph 120b). This report will be attached to the SF 88 before the wing-base surgeon or hospital commander reviews and approves it.
(3) When SF 88 indicates that there is evidence of a mental illness, further processing under this regu *808 lation will be held in abeyance pending the airman’s appearance before a medical board in accordance with AFM 35-4. If the medical board recommends that the airman appear before a physical evaluation board in accordance with AFM 85 — 4, action under this regulation will be discontinued. If the medical board recommends that the airman be returned to duty, action under this regulation will be resumed.
* * * * *
The report of a medical examination conducted in April 1960 at Walker Air Force Base, New Mexico, contained the following comments: (1) “Essentially negative physical examination under the provisions of AFE 39-16 or 39-17 separation” and (2) “No indications for separation under the provisions of AFM 35-4” and resulted in a determination that plaintiff was qualified for general military service. The report also showed that each item under the physical profile was given a designation of “1.”
On May 2, 1960, the officer who previously recommended plaintiff for the Good Conduct Medal requested that plaintiff be discharged as being “unsuitable for further military service” and on May 26, 1960, the recommendation for discharge was approved and directed under AFB 39-16, § A, para. 4b. On November 30, 1960, the Air Force Discharge Beview Board found plaintiff had been properly discharged and denied a waiver to permit plaintiff to reenlist and also denied his request for “financial compensation.”
This court stated in Sofranoff v. United States, 165 Ct. Cl. 470, 477-478 (1964), as follows:
Though we shrink from venturing into the morass of psychiatric terminology, it seems clear that, having had the benefit of * * * medical reports, the administrative officials must have had “doubt * * * as to the existence of a mental or physical disability” within the meaning of the regulation.
In the instant case it is clear that previous evaluations of plaintiff’s mental condition should have aroused enough doubt by administrative officials to require an evaluation of plaintiff by a qualified psychiatrist. This conclusion is buttressed by YA determinations that plaintiff had a service- *809 connected psychoneurotic disorder (anxiety reaction with a passive dependent personality) which merited a VA Disability Code rating of 50 percent from December 1, 1964, to March 21,1965; 100 percent from March 22,1965, to June 30, 1966; and 50 percent from July 1,1966. See Lawler v. United States, 169 Ct. Cl. 644, 646 (1965).
The defendant asserts that a thorough psychiatric examination immediately prior to plaintiff’s discharge would have sustained its determination that plaintiff was fit for general military duty. However, that argument highlights the pivotal factor in this case. It is precisely because the Air Force neglected to adhere to the provisions of its own regulation that we can never know what such an examination might have disclosed. With that vital information foreclosed to court scrutiny, the defendant would have us infer, or even determine by intuition, plaintiff’s condition on May 27,1960. But AFR 39-16 required, in explicit terms, that an airman with plaintiff’s type of history be evaluated by a competent psychiatrist before he could be discharged under that regulation.
The Air Force is bound by its regulations. Its failure to adhere to the provisions of AFR 39-16 under which plaintiff was discharged was an error of law. Vitarelli v. Seaton, 359 U.S. 535, 546-547 (1959) (Frankfurter, J., separate opinion); Service v. Dulles, 354 U.S. 363 (1957); Sofranoff v. United States, supra, 165 Ct. Cl. 476; Barnes v. United States, 163 Ct. Cl. 321, 327 (1963); Smith v. United States, 155 Ct. Cl. 682, 691 (1961). See generally the other cases cited in McCallin v. United States, 180 Ct. Cl. 220, 233-34 (1967).
It is plain therefore that plaintiff was not validly separated from the Air Force in May 1960 and that he could, if he wished, seek active duty pay (until the expiration of his enlistment in February 1962). See, e.g., Hamlin v. United States, ante, at 137; Hankins v. United States, ante, at 32; Sofranoff v. United States, supra, 165 Ct. Cl. 476. His petition, however, seeks disability retired pay, not active duty pay. Ordinarily the initial determination of the question of whether a serviceman is entitled to disability retired pay must be -made by the Secretary of the service or his designated *810 delegate. See Friedman v. United States, 159 Ct. Cl. 1, 13-14, 310 F. 2d 381, 389-90 (1962), cert. denied, 373 U.S. 932 (1963); Harper v. United States, 159 Ct. Cl. 135, 138-39, 310 F. 2d 405, 406-07 (1962). In this instance we can assume that, because of the particular method the Air Force chose to separate plaintiff, no proper board or tribunal considered the question of disability retirement,[7] and we can also assume that plaintiff did not ask for that relief. But the petition in this court does allege that plaintiff was disabled at the time of his discharge. The answer denied these allegations and a full trial was held, without objection by the Government, on the issue of entitlement to disability retirement. No defense was raised — in the answer, at pre-trial, during the trial, or while the commissioner was considering the case after trial— that the initial determination of that question had to be made by a proper military tribunal; apparently the first time that defense was made was in the defendant’s brief to the court excepting to the commissioner’s report. In these circumstances we hold that the Government has waived the defense, and that the point is waivable. Like the consideration by this court of de novo evidence in cases governed by the Wunderlich Act (Stein Bros. Mfg. Co. v. United States, 162 Ct. Cl. 802, 337 F. 2d 816 (1963); WPC Enterprises, Inc. v. United States, 163 Ct. Cl. 1, 8, 323 F. 2d 874, 878 (1963), and similar decisions), the defense that a proper military board failed to act on the question of disability retirement is non-jurisdictional and therefore waivable by failure to object — and we think it clear that the defense was waived here by the defendant’s course of action.[8] For this reason we do not believe that we must discard the full record which was made in this court and compel the parties at this late date to make another full *811 record (on the very same issue) before the Air Force Correction Board.
We are not, however, in a position to determine the issue at this time. Though, as we have said, a full record was made in this court and the parties submitted the issue to the trial commissioner, Commissioner McMurray did not decide whether plaintiff was disabled in 1960, nor did he make sufficient subsidiary findings leading to a determination of that issue. We must remand the case to another commissioner (Commissioner McMurray having retired) to determine whether plaintiff was disabled in May 1960, under the appropriate standards, and therefore entitled to disability retirement pay. In view of the full record already made, it will not be necessary to hold a further trial or to receive additional evidence on the question of disability vel non. The commissioner should determine, on the existing record if possible,[9] whether plaintiff was so disabled and, if so, the extent of his disability, and should make the necessary supplementary findings. The case is remanded to the trial commissioner for further proceedings in accordance with this opinion.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Paul H. McMurray, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff, a citizen of the United States and a resident of North Carolina, was born January 16,1930, in High Point, North Carolina.
2. Plaintiff enlisted in the United States Army on January 2, 1941, and served in that capacity until January 11, 1950, when he was honorably discharged for the convenience of the Government. At the time of enlistment he had an eighth grade education. During his enlistment period, plaintiff was integrated into the United States Air Force (USAF) at the time of the establishment of the Department of the *812 Air Force. Plaintiff enlisted in the USAF Reserve on January 31,1950. He was called to active duty on November 12, 1950, and honorably discharged on November 11, 1951 (release from active duty). Plaintiff reenlisted in the USAF on December 5,1951, and served until December 4,1955. During this latter period of service he served overseas in Korea and was awarded the Korean Service Medal with two Battle Stars. Plaintiff reenlisted in the USAF on February 6,1956, and served until he was honorably discharged on May 27, 1960, by reason of unsuitability. At the time of his discharge in 1960, plaintiff had attained the equivalent of a high school education.
3. From March 1,1957 to May 27,1960, plaintiff served in the grade of Staff Sergeant. Plaintiff lost no time from duty during his military career due to disciplinary action. At the time of his discharge plaintiff was assigned to the 58th Fighter Interceptor Squadron, Air Defense Command, Walker Air Force Base, New Mexico. His enlistment was not due to expire until February 5, 1962.
4. At the time of his discharge plaintiff had completed a total of 13 years and 11 days of active service, including 2 years, 11 months and 3 days of overseas service. His overseas service consisted of duty in Okinawa from January 1948 to June 1959; Korea from July 1952 to July 1953; and Germany from September 1956 to August 1959.
5. During plaintiff’s initial period of enlistment from January 1947 to January 1950, his primary duty assignment was that of an ammunitions helper. He also served in that capacity and as a weapons specialist during a period of service in the inactive Reserve. During his tours of duty from December 1951 to December Í955, and from February 1956 to May 1960, plaintiff served as a munitions specialist, except for the period from approximately October 1959 to March 1960 when he served as a munitions technician. Plaintiff’s duties as a munitions specialist were set forth in the Airman Classification Manual, Air Force Manual 35-1, dated December 1, 1959, as follows:
Assembles, maintains, stores, grades, reconditions, handles, and destroys explosives, incendiary and toxic munitions, warheads, and solid propellant rockets; *813 handles and assists in loading conventional and nuclear munitions and guided air missile; decontaminates areas and equipment exposed to toxic and radioactive materials.
6. During plaintiff’s period of service from January 22, 1947 to January 11, 1950, all of his character and efficiency ratings were “excellent.” No character or efficiency ratings were recorded during plaintiff’s active duty from November 12, 1950 to November 11,1951. Plaintiff was promoted from Private First Class to Corporal on February 1,1951. During the period of active duty from December 5,1951 to December 4,1955, plaintiff’s character and efficiency were rated “excellent.” He was promoted from Private First Class to Airman Second Class on June 1,1952, and from Airman Second Class to Airman First Class on April 1,1954. One Airman Performance Report (APR) was made during that period of service describing plaintiff’s overall evaluation as “Very Good” and he was recommended for promotion. Plaintiff reenlisted in the USAF on February 6,1956, in the grade of Airman First Class. For the period February 6,1956 to September 24,1956, while assigned to duty at Plamilton AFB, plaintiff’s character and efficiency were rated as “excellent.” He was promoted to Staff Sergeant on March 1,1957. An APR rendered for the period March 31,1957 to March 31,1958, rated plaintiff as a “Very Good Airman” and it was recommended that he be promoted along with other airmen of similar experience. Plaintiff’s unit commander recommended plaintiff for the Good Conduct Medal. Plaintiff’s APR for the period April 1, 1958 to March 31, 1960, rated him a “Very Good Airman,” and he was recommended for promotion along with airmen of similar service and experience. The report stated:
STRENGTHS: SSgt. Russell is a conscientious worker and has an extensive knowledge of his job specialty in the munitions career field. He readily accepts those responsibilities assigned to him and in their discharge produces acceptable results with an absolute minimum of supervision.
Recommended Improvement Areas: Due to a nervous condition it is recommended that Sgt. Russell be given medical aid to help combat his nervousness. Subject NCO should be given every opportunity to super *814 vise personnel so as to enhance his supervisory potentialities.
Facts AND Specific AchievemeNts : Sgt. Russell is inclined at times to moodiness due to a nervous condition. He has on numerous occasions worked long hours after duty which has tremendously helped this squadron’s combat effectiveness.
Suggested ASSIGNMENTS: Recommend subject NCO be crossed trained [sic] into a career field commensurate with his physical condition.
On April 6,1960, plaintiff was again recommended for the Good Conduct Medal. That medal, with three loops, was awarded plaintiff during his active military service.
7. Based upon medical examinations conducted for purposes of enlistment, discharge, or extended active duty on January 21,1948; January 10,1950; November 14,1950; October 31, 1951; December 5, 1951; November 21, 1955; and February 6, 1956, plaintiff was found to be “physically qualified.”
8. From August 7 to 16,1947, plaintiff was hospitalized for “nervousness.” His previous personal history indicated he had been nervous for many years. Despite the nervousness, plaintiff had been performing his work in a satisfactory manner. He was diagnosed as having a mild anxiety manifested externally by tremulousness of about 5 years’ duration. The final diagnosis was: “Anxiety reaction, mild, chronic.” His physical profile was recorded as 1-1-1-1-1-2.
9. From March 7 to 12,1952, plaintiff was hospitalized because he was “nervous, upset, shaking — since teens, worse now.” The final diagnosis was “Anxiety reaction” in line of duty.
10. From January 14,1954 to February 23,1956, plaintiff received no medical treatment, nor did he complain of any psychiatric problem. On February 23,1956, plaintiff was examined for “stomach trouble” and was observed to be “nervous.” On March 8, 1956, plaintiff was examined for a “pain in the scalp vertex” and on July 10,1956, when being examined for the same ailment, he appeared “very nervous” and was given medication. On April 15, 1957, plaintiff complained of a pain in the lower abdomen, was hospitalized *815 for observation, and discharged to duty on April 17, 1957.
11. On. January 24, 1958, plaintiff was seen on an outpatient basis at which time he was reported “extremely anxious.” The stomach symptoms he complained of were attributed to emotional upset. Plaintiff was given a prescription for meprobamate.
12. On August 11, 1958, because plaintiff was “extremely nervous” and intermittently on meprobamate for 6 months, the 7425th USAF Hospital in Germany where plaintiff had been treated on an outpatient basis requested a psychiatric evaluation. It was noted plaintiff had already been twice hospitalized for “nerves” and he was concerned about his stomach, was “very apprehensive” and “tremulous.” A provisional diagnosis of “Chronic Anxiety Reaction” was recorded.
13. On August 29,1958, a consultation report was made by Captain Robert E. Froelich indicating that plaintiff was very tense, with a tendency toward rambling, paranoid ideation and marked suspiciousness. The diagnosis was:
SchizophkeNIC Reaction, paranoid type, chronic, moderate, manifested by difficulty in interpersonal relationships, restlessness and some anxiety.
Stress: minimal; Predisp: marked; Impairment: moderate.
LD: Undet.
Plaintiff was scheduled to be admitted to the hospital for further evaluation. Dr. Froelich was not a psychiatrist and his special training in the area of psychiatry consisted of a 4-month course.
14. Between September 2-11, 1958, plaintiff was hospitalized at the USAF Hospital at Wiesbaden, Germany. The diagnosis of the attending physician, Captain David A. Turner, was:
Emotional Instabhitt Reaction, chronic, moderate, manifested by excitability, explosiveness, emotional lability, moderate anxiety and trends toward paranoid ideation.
# jf: # H* ❖
Impairment was classed as moderate. The condition, in the physician’s opinion, was not incurred in the line of duty, *816 having existed prior to plaintiff’s entry into the service. The record does not reflect the degree of training Captain Turner had in psychiatry.
15. On September 11,1958, plaintiff was returned to duty. Sparine 100 mg four times a day was prescribed and plaintiff was given a month’s supply of that drug. Plaintiff was also given refill prescriptions of Sparine, 100 to a refill, on October 20,1958; November 7,1958; and November 21,1958. On December 4,1958, plaintiff was given a refill prescription of Sparine No. 200. On February 25,1959, plaintiff was given the “more readily available” Meprobamate No. 120. On June 16, 1959, he was returned to Sparine, 100 mg, q.i.d. On July 24,1959, plaintiff was given a refill of Sparine “0/050 No. 80” to be taken four times a day.
16. On January 26, 1960, the administrative officer of plaintiff’s unit requested that a psychiatric examination be given plaintiff, without stating the reason.
17. On February 12,1960, Captain David R. Rubin, USAF Medical Corps, at Walker AFB Hospital, New Mexico, prepared a “Narrative Summary” (Standard Form 502) concerning plaintiff’s mental condition. Dr. Rubin noted the patient was “extremely suspicious,” and, taking into consideration previous diagnoses of the plaintiff as a psychotic with a character and behavior disorder, “strongly recommended that * * * [plaintiff] be removed immediately from any critical position.” The record does not show how many times Captain Rubin saw plaintiff before making the evaluation. Plaintiff was interviewed as an outpatient. Captain Rubin was not a psychiatrist, having had approximately 6 month’s training in psychiatry. Psychiatric cases were referred to Dr. Rubin because he was the one physician at the hospital who was interested in that branch of medicine. The request for a psychiatric examination of plaintiff did not indicate the basis for such request. The defendant’s witness, a psychiatrist who has frequently conducted such psychiatric examinations, testified that he would not see an individual unless some reason was stated for thinking the man was ilk It is obviously helpful and important to obtain some information on which to base such examination. The same witness *817 stated that although Dr. Rubin’s report was treated as a psychiatric examination, it was “very brief” and did not “cover many things that might ordinarily be covered” in such a report.
18. On April 12,1960, upon the request of plaintiff’s unit, plaintiff was assigned counsel to represent him in a contemplated discharge action under AFR 39-16, sec. A, para. 4b, which provided for discharge of airmen with character and behavior disorders. Plaintiff was apprised of his rights of (1) personal appearance before a board of officers and (2) submission of statements in his own behalf.
19. On April 15, 1960, plaintiff was officially notified that he was being considered for discharge under honorable conditions under the provisions of sec. A, para. 4b, AFR 39-16. The reasons for this proposed action were:
a. You are presently working out of your AFSO and further training or cross training is impractical as indicated in your medical and psychiatric examination.
b. You have a long Medical History of extreme anxiety, emotional instability, and schizophrenic reaction and it has been determined that you are unsuitable for further military service.
20. On April 25,1960, a “Report of Medical Examination” (Standard Form 88) was prepared by Captain E. M. Bradley. Captain Bradley was not a psychiatrist. In Captain Bradley’s opinion the examination was “essentially negative * * * under the provisions of AFR 39-16 or 39-17 separation.” No bases for separation under AFM 35-4 were recorded and plaintiff was found to be qualified for general military service.
21. Plaintiff and his military counsel in an undated document requested a hearing before a board of officers. On May 1, 1960, plaintiff waived a hearing before a board of officers in a document not endorsed by his counsel. A second communication on this date, signed by both plaintiff and his counsel, waived a hearing before a board of officers and plaintiff stated he was not submitting any statements in his own behalf.
22. On May 2,1960, Lt. Col. Lester R. Kress, who 26 days earlier had recommended plaintiff for a Good Conduct Medal *818 (finding 6, supra), requested that plaintiff be processed for discharge under the provisions of sec. A, para. 4b, AFE 39-16, because it was the Colonel’s opinion “that the respondent is unsuitable for further military service.”
23. On May 26, 1960, the recommendation for discharge was approved and directed under AFE 39-16, sec. A, para. 4b. On May 27, 1960, plaintiff was discharged by Special Orders Number A-525, effective the previous day.
24. On October 10,1960, plaintiff applied to the Air Force Discharge Eeview Board (AFDEB) “To be Ee-enlisted in the Grade of S/Sgt in the USAF or receive financial compensation.” Attached to this application was a statement by Kenneth H. Epple, a psychiatrist, dated October 3, 1960, expressing the opinion that plaintiff did not show any evidence of schizophrenic reaction, extreme anxiety or emotional instability, and that plaintiff’s emotional adjustment must have been reasonably good in light of his work record and continued enlistments in the Air Force. The doctor cautioned that his conclusion was based on the available information from the examinee during his recent interviews and the few Air Force documents to which he was personally directed. Past medical records were not available to Dr. Epple. The doctor “noted” he did not see plaintiff in his natural environmental setting. The doctor recommended that plaintiff’s application for renlistment be given “most serious consideration.”
25. On November 30,1960, the AFDEB found plaintiff was properly discharged and denied his request for a waiver to permit reenlistment. On December 6, 1960, plaintiff was advised of the denial of his application.
26. On December 14,1962, on the basis of plaintiff’s service medical records, the Veterans Administration (VA) concluded
•I* $ ‡ s]t 4*
* * * although the service department held that the initial hospitalization for anxiety reaction was the result of pre-service disability, the fact that veteran served almost continuously for five years until war time in 1952, it must be conceded that the condition was aggravated by military service for hospitalization and treatment *819 purposes. The board is aware that this is an unusual procedure in granting service-connection for for [sic] hospitalization or treatment purposes without evaluation with a pending claim for disability compensation. However, previously scheduled “at once” examination has not been received and the service officer has indicated that the veteran is in dire need of hospitalization for nervous disability and for that reason service-connection is being established in the present format to facilitate veteran’s admission to the VA Hospital.
27. On September 20,1962, plaintiff applied to the YA for compensation or a pension. On September 23,1962, Dr. Kenneth H. Epple examined the plaintiff and made the following diagnosis:
* * * 1. Anxiety reaction with depressive features. 2. Personality pattern disturbance — paranoid personality. In light of Mr. Kussell’s inability to adjust to his life following discharge and his present symptomatol-ogy, I would favor in-patient psychiatric care at the Veterans Administration Hospital. * * *
28. On November 26, 1962, plaintiff underwent a VA psychiatric examination for disability evaluation conducted by the Chief of Neuropsychiatry of the Veterans Hospital. Except for his “rather unusual sensitiveness and suspiciousness,” plaintiff did not appear psychotic to the examining physician. The doctor did “not want to diagnose * * * [plaintiff psychotic] on a single interview which postulated schizophrenic as a very tentative diagnosis while he was in the service.” The doctor did make the following diagnoses:
Personality disorders: Personality pattern-disturbance: Emotionally unstable personality.
If a more definitive diagnosis was considered necessary, the examining physician suggested plaintiff be returned for observation to a psychiatric inpatient situation.
29. Plaintiff was hospitalized from December 19, 1962 to December 12, 1963,[1] at the VA Hospital, Durham, North Carolina. On March 6,1963, it was noted in an Interim Summary that plaintiff was started on subcoma insulin treatment *820 on January 28,1963. This summary reported an “established clinical diagnosis” as follows:
1. Psychoneurotic anxiety reaction, with passive de-
a. Predisposition: Unknown,
ib. Precipitating stress: Unknown,
c. Degree of .psychiatric impairment — at time of admission : Moderate to severe; at time of dictation: Moderate.
On January 8, 1964, a Final Summary repeated the clinical diagnosis, and stated that at the time of discharge from the hospital plaintiff was “Improved.”
30. On April 26-30,1963, the VA rendered a Rating Decision which recorded a narrative review of plaintiff’s condition and a diagnosis of “Psychoneurotic Anxiety Reaction With Passive Dependent Personality Disorder, Competent” rated from December 19, 1962, at 100 percent under VA Diagnostic Code (VADC) 9400 of the VA Schedule for Rating Disabilities (Schedule).
31. On May 13,1964, a VA rating decision reported plaintiff as having a “Psychoneurotic Anxiety Reaction With Passive Dependent Personality Disorder, Moderate” rated at 100 percent from December 19, 1962, and 10 percent from January 1, 1964, under VADC 9400 of the Schedule.
32. Plaintiff was hospitalized from July 23,1964 to November 3, 1964, at the VA Hospital, Salisbury, North Carolina. The Admission Diagnosis was “Depressive reaction.” On September 21, 1964, Dr. E. A. MacMillan disagnosed plaintiff as suffering from:
(1) Anxiety reaction with depressive features. Stress: Undetermined. Predisposition: Passive dependent personality. Impairment: Severe.
Plaintiff was considered to be competent and continued hospitalization was recommended. The “Final Summary” dated November 3,1964, diagnosed plaintiff’s condition as “Anxiety reaction with depressive features, moderate.” The report also stated: “There was some suspicion that he was a paranoid schizophrenic, but psychological studies ruled this out.”
33. On December 9,1964, the VA rated plaintiff, reporting “Anxiety reaction with depressive features,” ratable at 10 *821 percent from January 1, 1964; 100 percent from July 23, 1964 to December 1, 1964; and from December 1, 1964, at 10 percent under VADC 9400 of the Schedule.
34. Plaintiff was readmitted to the VA Hospital, Salisbury, North Carolina, on March 22, 1965, where he remained until June 24, 1966. At the time of discharge the diagnosis rendered by Dr. James H. Hawkes, a psychiatrist, was “Anxiety reaction with depressive and paranoid features, severe.” The final hospital summary, dated July 5, 1966, stated, in pertinent part:
* * * Physical and neurological examinations are negative. Mentally, he shows deep-seated anxiety, is tense, has a fine tremor of his extended fingers, and his voice is tremulous. He is depressed in mood, describes his situation as “frustrating”, and says he is not able to cope with life’s situations. He shows some paranoid thinking, feels that people are against him and are laughing at him. * * * denies hearing voices, is seclusive, does not have any friends, has no hobbies, and spends his time just sitting around brooding and thinking. He is well oriented. During this period of hospitalization, he has shown little essential change. Attempts have been made to obtain employment for him, but he remains indecisive, unable to cope with any really productive situation, and is lacking in the capacity to fend for himself. He is considered to be competent. The medical staff felt that prolonged hospitalization of this patient was detrimental to him and felt that he should be discharged and forced to accept an employment situation. He was accordingly discharged on 6/24/66 as having attained maximum benefit from hospitalization and was furnished medication consisting of Mellaril 100 mgm t.i.d. for a 14-day period.
35. On August 22,1966, the VA determined plaintiff’s service-connected disability should be rated as 50 percent disabling from December 1,1964 to March 21,1965; 100 percent from March 22, 1965 to June 30, 1966; and 50 percent from July 1,1966.
CONCLUSION OK LAW
Upon the foregoing findings of fact which are made part of the judgment herein, the court concludes as a matter of law *822 that plaintiff was improperly discharged from the Air Force in May 1960 and remands the case for further proceedings in accordance with the opinion.

We use the opinion of Commissioner Paul H. McMurray, with some changes and additions. On the main issue we agree with and follow his views, but our disposition of the case is different.

 See 10 U.S.C. §§ 1201-1202 (1964).

 Some of the activities of a munitions specialist are to destroy explosives and incendiary and toxic munitions, warheads and solid propellant rockets; to decontaminate areas and equipment exposed to toxic and radioactive materials.

 None of the diagnoses relating to plaintiff’s mental state, made by Armed Services personnel, were made by qualified phychiatrists.

 During the trial a qualified psychiatrist testified that the failure to state the reason a psychiatric evaluation was requested should have aborted the request. He stated he would not have conducted the examination until the reason for it was supplied because such information is vital to properly orient such an examination.

 The examining physician had approximately 6 months of psychiatric training. No candidate is eligible for examination for certification in psychiatry or neurology until he has completed at least 5 years of special training and experience in either field. See Directory of Medical Specialists, Volume XI (1963-64) 11th ed., pp. 1302-1306. Psychiatric examination eases were referred to the examining physician because he was the only physician at the hospital who had an interest in that field.

 Air Force Manual 35-4, dated February 1, 1960, paragraph 1-M, provides for evaluation as to fitness for general military service or retirement by reason of physical unfitness, -which it defines as “physical inability to perform the duties of the grade held which are required during the performance of full military duty, field, as well as garrison, in both peace and war.”

 It can be argued, on the other hand, that the Air Force, by choosing to discharge plaintiff tinder AFK 39-16 for a “character and behavior disorder” or a “personality disorder”, necessarily though impliedly determined that he was not unfit in the sense of being entitled to disability retirement. In this connection it should be noted that the medical examination made in connection with the discharge proceedings found that there were “no indications for separation under the provisions of AFM 35-4” [evaluation of fitness for general military service or retirement, see note 6 supra].

 See, also, United States v. L. A. Tucker Truck Lines, 344 U.S. 33, 36-38 (1952) ; North American Airlines v. Civil Aeronautics Board, 240 F. 2d 867, 874 (C.A.D.C., 1956), cert. denied, 353 U.S. 941 (1957) ; Adams v. Witmer, 271 F. 2d 29, 36-37 (C.A. 9, 1958).

 At the oral argument both sides assured us that the existing record is adequate to decide the issue of disability. We are not certain, however, whether that record is also sufficient to determine the percentage of disability, and we therefore give leave to the commissioner to supplement the record, if necessary, with respect to that latter issue.

 Plaintiff during this time had periods of convalescent leave.