Per Curiam:
This case was referred to Trial Commissioner W. Ney Evans, with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Buie 57(a). The commissioner has done so in an opinion and report filed June 26,1967. Exceptions to the commissioner’s opinion, findings of fact and recommended conclusion of law were filed by the plaintiff and the case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court is in agreement with the opinion, findings and recommendation of the commissioner, it hereby adopts the same as the basis for its judgment in this case as hereinafter set forth. Therefore, plaintiff is not entitled to recover and the petition is dismissed.
OPIRIOR 0E COMMISSIONER
Evans, Commissioner: Appended to the Veterans Administration Bating Schedule code 5002, relating to atrophic (rheumatoid) arthritis, is a note which directs that “when the diagnosis of atrophic arthritis is not fully substantiated, rate as hypertrophic arthritis below” (code 5003).
*231 The Secretary of the Air Force accordingly rated plaintiff’s atrophic arthritis under code 5003, resulting in a reduction of her disability rating below 30 percent, as a consequence of which her name was removed from the Temporary Disability Eetired List and she was separated from the Sendee with severance pay. Implicit in this action was a finding by the Secretary that the diagnosis of atrophic arthritis was not fully substantiated.
The conclusion recited in finding 15(a), that the Secretary’s finding was supported by substantial evidence within the context of Beckham v. United States, 179 Ct. Cl. 539, 375 F. 2d 782 (1967), cert. dismissed, 389 U.S. 1011, is dispositive of the case.
FINDINGS of Fact
1> (a) At all times material to this action, section 5002 of the Veterans Administration Eating Schedule, pertaining to arthritis, atrophic (rheumatoid), provided that disability from this condition could be rated from 10 percent to 100 percent in proportion to the number of joints involved and extent of joint involvement. With multiple joint involvement as prescribed by the section and actual beginning contracture with atrophy of muscles, the minimum rating was 50 percent.
(b) Section 5003 of the Eating Schedule pertained to arthritis, hypertrophic, degenerative arthritis, or osteoarthritis.[1] As in section 5002, ratings in the range of 10 percent to 100 percent were authorized, but the standards and allocations per joint involved differed from those in section 5002, and the provision for a 50-percent minimum was not contained in section 5003.
(c) A note appended to section 5002 provided as follows:
Note. When the diagnosis of atrophic arthritis is not fully substantiated, rate as hypertrophic arthritis below.
*232 The text of section 5003 followed immediately “below.”
(d) Under circumstances hereinafter described, the Secretary of the Air Force rated plaintiff’s arthritis under section 5003.[2] Implicit in this action was the finding that the diagnosis previously made of her condition as rheumatoid arthritis was not, at the time of rating, fully substantiated. The issue in the case is whether or not his action was warranted.
2. (a) Plaintiff enlisted in the Women’s Army Corps, Army of the United States, and entered on duty as a private on March 12, 1945. Her age at that túne (nearest birthday) was 40.
(b) There is in evidence a letter addressed to plaintiff’s attorney on August 18, 1964, by Dr. Carroll A. Russell, of San Kafael, California, pertaining to plaintiff, the text of which follows:
The above patient first came under my care in 1950. At that time she was 45 years of age and stationed at Hamilton Air Force Base. She had been on some hormone injections while stationed at Moses Lake and had some trophic dermatitis, axillary, from deodorants. In April 1952 she had a bursitis of the right shoulder and in July 1952 she had a bursitis of the left shoulder. In November of 1952 she fell on her left knee. It was swollen and ec-chymotic. She continued to have pain and discomfort in the knee, particularly during the winter of 1952. In January of 1953 she had pain in the joints of her hands, shoulders and knees. During that time she was put on Cortone 5 mg. three times daily through June of 1953. In August 1953 her feet began to bother her. She had a good deal of pain in the tarsal joints and bunions. X-rays were taken at Hamilton Field which showed minimal arthritic changes. A sedimentation rate was 15 mm. per hour corrected. I felt that she had a menopausal arthritis at that time. I last saw her in 1957 when she was still on some estrogenics and salicitates [sic]. During the time I was seeing her she had multiple joint complaints which I felt were menopausal arthritis. Her blood counts *233 showed a slight shift to the left. I was not able to confirm a rheumatoid arthritis diagnosis however because her work-up was done at several institutions and I do not feel that she ever had a really complete diagnostic work-up.
(c) Under date of December 21, 1961, Dr. Leonard L. Tormey, of Worcester, Massachusetts, certified—
* * * that Miss Celia G. Debs was under my care since September, 1957. Her admission diagnosis, based on the Service Findings, dated July 16, 1957 was Rheumatoid Disease.
There were no evidences of clinically active rheumatoid disease while under my observation. X-rays of the hands did show some static capsular thickening of the mid phalangeal joints, but the Sedimentation Rate was normal throughout that time.
Because of its subjectiveness, I have no data on the amount of her disability, neither do I have any information on her performance as an office worker.
3. (a) The Service Findings to which Dr. Tormey referred were made on July 16,1957, in the course of a medical examination at the Parks Air Force Base Hospital in California. Pertinent portions follow:
PRESENT illness : This 52 year old white, single, female T/Sgt. was admitted to this hospital 6 May 1957, from Hamilton AFB to meet a Physical Evaluation Board because of symptoms suggestive of rheumatoid arthritis for the past five years. The patient states that she had a condition diagnosed as bursitis of the right shoulder in 1952. Later the same year she noted pain and stiffness in the hands and feet. This has progressed gradually to involve the feet, shoulders and knees to a limited extent, although the hands are most severely affected. * * *
$ $ ‡ ‡
physical examination: * * * Pertinent physical findings were limited to slight deformity of the interpha-langeal joints of both hands, and to some mild limitation of movements of the hands and trunk muscles.
_ X-rays of both hands revealed moderate demineralization of the bony structures and narrowing of the inter-phalangeal joints bilaterally, with demineralization being the most marked in the subchondral location. * * * X-ray of the right shoulder revealed no evidence of *234 either arthritic change or of soft tissue calcification. * * * X-rays of the knees, ankles, elbows and lumbosacral spines revealed diffuse demineralization of the bony structure, but no specific changes in either the apophyseal or sacro-iliac joints, consistent with rheumatoid spondylitis. The hip joints revealed no specific arthritic change, neither did the knees or elbows. The x-rays of the ankles revealed considerable soft tissue swelling around the lateral malleolus of each ankle, but again no evidence of specific joint disease. * * *
K: *
course DURING hospitalization: The patient was followed for some time with daily sedimentation rates, none of which were elevated. * * *
Throughout her hospitalization, the patient had occasional episodes of pain in the hands and in the knees, accompanied by stiffness, and on several occasions slight warmth was noted; although none of these episodes were very severe. The only specific x-ray changes suggestive of rheumatoid arthritis were those in the hands noted above. However, in view of this, and the rather typical history, despite the fact that sedimentation rates were never elevated, it was felt that rheumatoid arthritis was the only diagnosis justified to account for the joint symptoms. The osteoporosis noted elsewhere was not felt to contribute to the symptoms. * * *
CONDITION UPON COMPLETION OP HOSPITALIZATION: This 52 year old, white, female, T/Sgt. has had symptoms of rheumatoid arthritis for five years. These symptoms are most severe in the hands and at times are so severe as to interfere with her duties as a stenographer.
CIRCUMSTANCES OP ONSET OP MEDICAL CONDITION: The symptoms of this disease began while the patient was on active duty in the USAF, about 5 years ago and have gradually progressed.
diagnosis: Dg. 1. (7220) Arthritis, rheumatoid, involving small joints of hands, knees, shoulders and feet.
(b) On the same day, July 16, 1957, a Medical Board (convened at Hamilton Air Force Base) found plaintiff unfit for duty and recommended that her record be forwarded for evaluation by a Physical Evaluation Board (hereafter PEB).
(c) Likewise on the same day, July 16, 1957, a PEB met pursuant to orders at Parks Air Force Base and recommended *235 that plaintiff be placed on the Temporary Disability Retired List (hereafter TDRL) with a compensable disability rating of 60 percent for a condition diagnosed as “arthritis, rheumatoid.”[3]
(d) On July 24,1957, the Physical Review Council (hereafter PRC) Headquarters, United States Air Force, having considered the material that was before the PEB, advised the Personnel Council (in the Office of the Secretary of the Air Force) of the following determinations by the PRC:
a. That member is unfit to perform the duties of his grade because of physical disability incurred while entitled to basic pay.
*****
d. That the disability is rated at sixty (60) per cent under the standard schedule for rating disabilities in use by the Veterans’ Administration at the time of the determination.
e. That the diagnosis is Arthritis, rheumatoid, involving: 5002 right hand (10%); left hand (10%) ; right knee (10%); left knee (10%); right shoulder (10%); left shoulder (10%): right foot (10%); left foot (10%); Combined Rating 57%, Bilateral Factor 5.7%; Added Rating 62.7; Total Compensable Rating 60%.
f. Inat accepted medical principles indicate that the disability may be of a permanent nature.
g. That member be physically re-examined 15 months after placement of his name on the Temporary Disability Retired List.
‡ ‡
(e) The PRC recommended—
* * * that necessary action be taken to place the name of the member upon the Temporary Disability Retired List under the provisions of section 1202 of Title 10, United States Code.
(f) The recommendation of the PRC was approved by the Secretary of the Air Force, and plaintiff was placed on the TDRL effective August 12,1957.
(g) While plaintiff remained on the TDRL (until July 31, 1960, as hereinafter noted), she received monthly retirement *236 pay of not less than 50 percent of her monthly basic pay, pursuant to the provisions of section 1401 of title 10, United States Code (1958 ed.).
II
4. (a) Under the provisions of section 1210 of title 10, United States Code, and the implementing Air Force regulations,[4] an individual (member) placed on the TUBE is required to be given a physical examination at least once every 18 months for reevaluation of the condition for which he was temporarily retired.
(b) Following is a summary of the review process as applied to the periodic physical examinations of members on the TDKL.
(1) The examining doctor’s findings are submitted to the PEC for its consideration and recommendation with regard to the disposition of the case.
(2) The findings of the PEC include its recommendation as to the percentage of disability.
(3) These findings (of the PEC) are submitted to the member for his concurrence or nonconcurrence.
(4) If the member does not concur, he is entitled to have his case considered by a PEB.
(5) If his case is considered by a PEB, the usual procedure includes a further physical examination at the hospital where the PEB is located.
(6) The findings of the physical examination are forwarded to the PEB, sometimes as a supplement to previous records, sometimes in lieu of previous findings.
(7) The PEB considers the case and makes recommended findings.
(8) The findings recommended by the PEB are referred to the PEC for review.
(9) The PEC reviews all of the medical records, as well as the proceedings before the most recent PEB, and makes recommended findings.
(10) The recommended findings of the PEC are submitted to the member, for concurrence or rebuttal.
*237 (11) If the PRC in its recommended findings concurs with the recommended findings of the PEB, or makes only minor changes, then the case is presented to the Secretary of the Air Force for final action.
(12) If the PRC disagrees with the findings of the PEB and the member disagrees with the findings of the PRC, the case automatically goes to the Physical Disability Appeal Board (PDAB) for review.
(13) The PDAB, in its review, is not bound by the findings of either the PEB or the PRC. It can make entirely independent findings.
(14) The review by the PDAB is a final review. Its recommended findings are submitted to the Secretary of the Air Force for his action thereon.
(c) One of the purposes to be served by the PRO is the effort to attain consistency and equality in the rating determinations.
Ill
5. (a) On December 2,1958, plaintiff was admitted to the Air Force hospital at Westover (Massachusetts) Air Force Base for her periodic TDRL checkup.
(b) Following are excerpts from the medical report of that examination:
PRESENT ILLNESS
* * * This patient’s history dates back to approximately 1945, when she had clinical signs and symptoms compatible with an arthritic syndrome. At that time patient’s complaints were generalized aches and pains, most marked of the hands and feet, aggravated by damp and cold weather, with occasional swelling of these joints. She also had occasional pain of both shoulders, back, etc. From this time period, patient received various types of medications including salicylates, steroids, physiotherapy and many other unknown preparations. The symptom complex became progressively worse and while patient was stationed at Hamilton AFB, Calif. * * * she met a Physical Evaluation Board, which recommended separation from active duty. At time of separation from the Air Force, patient received 60% temporary disability with a diagnosis of rheumatoid arthritis, generalized. This is the first examination at a military or *238 VA facility since discharge from the service * * *. At the present time patient is unemployed although she works occasionally a few hours a day as a typist. She has no subjective complaints other than the previously mentioned pains of hands and feet.
PAST HISTORY
Essentially noncontributory.
PHYSICAL EXAMINATION
* * * She was * * * in no acute distress * * *. The extremities showed bilateral scaliness with excoriation of the palmar surfaces, minimal swelling deformity most prominent of the proximal interphalangeal joints, and bilateral hallus [sic] valgus, first metatarsal phalangeal joints * * *. There were no other abnormal physical findings.
LABORATORY DATA
* * * X-ray of the hands and feet revealed bilateral hallux valgus with mild subluxations of the first metatarsal phalangeal joint and interphalangeal joints. The phalangeal joints are all narrowed without destructive changes other than a few subarticular cystic areas. In the hands there is phalangeal joint narrowing and occasional subarticular cystic lesions. The impression was mild rheumatoid joint changes.
HOSPITAL COURSE
Uneventful. Patient * * * had no subjective complaints during entire hospitalization.
RECOMMENDATIONS
Although patient demonstrates little disability at time of this examination, in view of the past history of rheumatoid arthritis, generalized, and with a history flare-ups [sic], especially in cold damp weather, it is recommended that she be continued in her present status.
DIAGNOSIS
* * * Examination, physical, in connection with temporary disability retirement for — 7220—Arthritis, rheumatoid, generalized.
(c) The results of the examination were submitted to the PEC. Its recommended findings were:[5]
‡ ‡ ‡ $
*239 a. That member is unfit to perform the duties of his grade because of physical disability.
b. That, in accordance with the standard schedule for rating disabilities in use by the Veterans’ Administration at the time of the determination, such disability is rated at forty (40) per cent.
c. That the diagnosis is Arthritis, rheumatoid, involving: 5002 right hand — 10%, left hand — 10%, right foot — 10%, left hand [sic] — 10%. Combined rating— 34%, Bilateral factor — 3.4%, Added rating — 37.4%. Total compensable rating — 40%.
d. That such disability may be of a permanent nature.
(d) The PRC recommended “that the name of the member be retained * * *” on the TDRL.
(e) On December 30, 1958, the findings of the PRC were approved by the Secretary, and plaintiff was continued on the TDRL with a disability rating of 40 percent.
6. (a) On January 27, 1960, plaintiff was again admitted to the Air Force hospital at Westover Air Force Base for another TDRL checkup. She was hospitalized for 2 days.
(b) Following are excerpts from the summary of the examination made at that time:
PRESENT illness * * * She dates her symptoms from 1950 when she was stationed in Washington. At that time a diagnosis of rheumatoid arthritis was established and she was transferred to Hamilton Field. At Hamilton Field the syndrome was so severe that it was necessary for the patient to meet a Physical Evaluation Board, and she. was separated from the service * * * with the diagnosis of rheumatoid arthritis, generalized. At that time her major problems were of the hands, shoulders and feet and she received 60% disability. * * * At the time of her last admission her final diagnosis was arthritis, rheumatoid, general. Since the time of her last admission she has been treated by a private physician with numerous medications at different times, the nature of which she does not know, with intermittent severity of pains in her joints, these pains being worse in damp weather. She also recently has been under emotional stress and feels that this may be aggravating her symptoms. physical examination — On admission patient was * * * in no acute distress. * * *
laboratory data * * * [S]ed. rate * * * negative. EKG was negative as was a chest x-ray, and x-rays of the hands.
*240 kecommeNdatioNS — At the present time the patient demonstrates almost no disability and there are no positive findings, however, in view of her history of flare-ups, especially m cold weather it is recommended that she be continued in her present status.
diagnosis— * * * Examination, physical, in connection with temporary physical disability retirement for— 7220 — Arthritis, rheumatoid, generalized.
(c) Upon review of the foregoing examination, the PEC by letter dated February 19, 1960, advised plaintiff that it had recommended—
at $ $ $ *
Eemoval from the Temporary Disability Eetired List and discharge with severance pay. Disability is less than thirty (30) per cent. (Severance pay equals two months basic pay multiplied by the total number of years of service performed by you, not to exceed twenty-four months pay).
(d) Plaintiff did not concur with the recommendation of the PEC and requested complete reprocessing by a PEB.[6]
7. (a) On April 4,1960, plaintiff was admitted to the Air Force hospital at Andrews Air Force Base, where she was given an examination preliminary to the processing of her case by the PEB.
(b) Following are excerpts from the report of that examination :
History of Present Illness: * * * She dates her symptoms from 1950, when she was stationed in Washington state. At that time a diagnosis of rheumatoid arthritis was established and she was transferred to Hamilton Field. At Hamilton Field the symptoms were so severe that it was necessary for the patient to meet a Physical *241 Evaluation Board and sbe was separated from the service * * * with the diagnosis of rheumatoid arthritis, generalized. At that time the major joints involved were of the hands, shoulders and feet and she received 60 percent disability. * * * At the time of her admission to Westover AFB in 1958, the diagnosis was arthritis, rheumatoid, general. During the latter part of 1958 and 1959, she was treated by a private physician with numerous medications at different times, the nature of which she did not know. This was for intermittent severity of pains in her joints, those pains having been worse in damp weather. She was again evaluated at Westover AFB in January 1960 and it was recommended that the patient be continued in her present status and she was noted to have almost no disability and there were no positive findings. The patient, however, was recommended to receive severance pay and less than 30 percent and due to her history and recurrent symptoms, patient was not recommended to be returned to duty. The patient appealed this decision and was referred to USAF Hospital Andrews for a work-up.
Physical Examination: * * * The physical examination at the present time reveals no rheumatoid deformity. The patient has full range of motion of all her joints. She has a marked severe bilateral hallux valgus. This deformity in no way resembles rheumatoid arthritis.
Laboratory Data: * * * Sedimentation rate at the time of admission was 4 mm. per hour and repeated sedimentation rate was 15 mm. per hour. * * * X-rays of the cervical spine revealed some degenerative changes associated with spur formation. These mild changes compatible with osteoarthritis were slightly more than would be expected in the average 54-year-old woman. There was no definite evidence of rheumatoid arthritis in the axial skeleton. Films of the shoulders, knees and elbows were within normal limits. X-rays of the hands revealed narrowing of the joint spaces of the interphalangeal joints and the metacarpophalangeal joints bilaterally which were consistent with changes seen with rheumatoid arthritis. Muscle testing and. evaluation of the degree of joint function was entirely within normal limits. * * *
Course in Hospital: The initial impression was that there was no evidence of an active rheumatoid arthritis and from the physical examination there were no abnormalities suggesting a previous rheumatoid arthritis. The patient continued to have subjective generalized arthralgias while in the hospital, particularly in the *242 hands. An orthopedic consultation was obtained and the opinion expressed was that at the present time there was no evidence of any joint changes clinically that would not be expected in a patient of this age.
Recommendations: The diagnosis of rheumatoid arthritis in this 54-year-old woman cannot be made at the present time on the basis of physical findings and the diagnosis is one made by history. The x-ray changes in the hands are consistent with, but not diagnostic of changes resulting from rheumatoid arthritis. Because this disease is likely to recur, even though she has no objective evidence of disability at the present time, it is recommended that the findings and recommendations made at Westover Air Force Base in January 1960 be confirmed.
Diagnoses: * * *
7220 — Rheumatoid arthritis, manifested by minimal changes in x-rays of the hands, normal range of motion in all joints, arthralgia of feet, ankles and knees.
íjí í¡s íjí *!•
7230 — Degenerative joint disease, multiple, due to unknown cause, cervical spine, mild.
(c) On May 10, 1960, plaintiff appeared and testified before a PEB at Andrews Air Force Base.[7]
.(d) The PEB’s recommended findings were that plaintiff was unfit for duty by reason of atrophic arthritis, with multiple group involvement of minor joints, which it rated as 50 percent disabling pursuant to section 5002 of the VA code. It further recommended that she be retained on the TDKL.
(e) The recommended findings of the PEB were forwarded to the PRC for review and recommendation, as required by regulations.
(f) On May 25, 1960, the PRC, after reviewing the proceedings of the PEB, recommended “revision of the findings as follows
$ ‡ ^ $
a. From 50% to 20% Compensable Rating.
b. From Retention on the Temporary Disability Retired List to Separation with Severance Pay.
*243 2. After a careful review of the records, it is the opinion of the Physical Review Council that the member’s condition is not of sufficient severity to warrant a rating of fifty (50) per cent for rheumatoid arthritis, but more accurately conforms with the twenty (20) per cent rating for arthritis, hypertrophic, with multiple involvement of minor joint groups, under diagnostic codes 5002-5003 of the Veterans Administration’s “Schedule for Rating Disabilities”.
3. Recommend Sergeant Debs’ name be removed from the Temporary Disability Retired List and she be separated from the service by reason of physical disability with entitlement to disability severance pay.
(g) On June 6, 1960, plaintiff submitted a rebuttal to the recommended findings of the PRC.
(h) On June 16, 1960, plaintiff’s records were forwarded to the PDAB for final review and recommendation. That Board, after considering the case, made the following findings and recommendations on June 23,1960 :
a. That the member is physically unfit to perform the duties of her grade by reason of physical disability incurred while entitled to basic pay.
b. That the diagaosis in her case is: Arthritis, atropic [sic], with multiple joint involvement, under diagnostic code numbers 5002-5003, with a disability rating of twenty (20) percent.
c. That, in accordance with the standard “Schedule for Rating Disabilities” in use by the Veterans Administration at the time of the determination, such disability is twenty (20) percent, and that the compensatory rating is twenty (20) percent.
d. That based upon accepted medical principles, the disability is of a permanent nature.
e. That maximum benefit of hospitalization has been obtained.
# ‡ ‡ $
g. That the date of origin of her disability (when the member incurred the disease which resulted in the physical disability) was 1950.
$ ‡ $
It is recommended that the member’s name be removed from the Temporary Disability Retired List and that the necessary action be taken to discharge Technical Ser *244 geant Celia G. Debs, AA 135 619, for physical disability under the provisions of Sections 1203 and 1210 of Title 10, USC, with the severance pay prescribed in Section 1212 of this Title.
(i) On July 22, 1960, the findings and recommendations of the PDAB were approved by the Secretary of the Air Force.
(j) On July 31, 1960, plaintiff’s name was removed from the TDBL and she was discharged from the Service with severance pay by reason of physical disability.
IV
8. (a) On August 11,1960, plaintiff filed a claim with the Veterans Administration for disability based upon service-connected rheumatoid arthritis. A physical examination was made on November 4, 1960. Following are excerpts from the report of that examination:
Radiographic Report
Right hand: Negative
Left hand: Negative
Right shoulder: Negative
Left shoulder: Negative
Bight knee: There is narrowing of the lateral half of the joint space. The rest of the knee appears normal.
Left knee: There is similar narrowing of the lateral half of the knee joint. The rest of the knee appears normal.
Bight foot: There is a marked hallux valgus deformity. No other significant abnormality is noted.
* * * Aside from painful abduction of shoulders ltd. to 130° because of pain, the joints are objectively negative — all others move well without complaints of pain— no deformity of fingers — wrists slightly tender — There is bilateral hallux valgus otherwise feet w.n.1. [within normal limits] Imp. subjective joints.
(b) The diagnosis of the examining doctor was “arthralgia [pain], generalized, subjective.”
(c) In its Bating Decision, the Board (of rating specialists : 1 medical; 1 legal; 1 occupational) found “service connection for claimed condition [rheumatoid arthritis] is warranted in the degree * * *” of 20 percent under diag *245 nostic code 5002. Award was made to plaintiff accordingly on November 21, 1960, effective from August 1, I960'.
9. On August 18, 1960, plaintiff submitted an application to the Air Force Board for the Correction of Military Kec-ords, requesting that her records be corrected to show that she should have been permanently retired for physical disability on July 31, 1960, rather than discharged with severance pay.
10. (a) On November 14, 1960, while her application to the Correction Board was pending, plaintiff was examined by Dr. Maurice H. Herzmark, a private physician specializing in orthopedic surgery, practicing in Washington, D.C.[8] While Dr. Herzmark examined plaintiff, he did not treat her. Her purpose in having the examination was primarily to determine the nature of her condition and what should be the permanent disability rating.
(b) Dr. Herzmark was called by plaintiff as a witness at the trial. He expressed the opinion that there was rheu-matoidal arthritic involvement, 40 percent disabling. He supported his opinion with objective symptoms derived from X-rays and other indicia obtained during the examination. Details are unimportant other than to say that his was a firm opinion of the correctness of his diagnosis derived from the exercise of professional skill and judgment by a trained physician, well qualified to form and express an opinion.
11. (a) In connection with plaintiff’s application to the Correction Board, her medical records were reviewed by the Surgeon General’s office, and the opinion of that office as expressed in a memorandum of February 10, 1961, was that plaintiff’s case “was properly processed and that no error or injustice has been done.” No change of record was recommended.
*246 (b.) On October 18, 1961, tbe Correction Board affirmed the recommendation of the PDAB by determining that no corrective action was indicated. Plaintiff was notified of this action on October 24,1961.
12.. (a) By letter dated January 29, 1962, the American Legion, acting on behalf of plaintiff, requested reconsideration of her case by the Correction Board. In support of its request, the American Legion submitted (1) the report of Dr. Leonard L. Tormey, dated December 21,1961 (quoted in finding 2(c)), and (2) the report of a medical examination of plaintiff’s feet made on December 12,1960, at Tripler Army Hospital.
(b) The latter report showed that plaintiff was referred to Orthopedics at Tripler Army Hospital on December 2, 1960, pursuant (1) to her request for corrective-type shoes and (2) to the request from the examining physician for an evaluation. Excerpts from the report follow:
This 55-year old retired TSgt/USAF/WAF (retired in 1957 for rheumatoid Arthritis) presents with the complaint of painful feet.
On physical examination, she has marked pes planus and bunions. The pain is actually over the bases of the metatarsals, classical of rheumatoid pain. On x-ray, she has large bunions and good evidence of osteoporosis around the metatarsal heads consistent with rheumatoid arthritis. Examined with Captain Wynne who recommends bunionectomy as the preliminary treatment in getting her in a pair of adequate walking shoes to reduce the discomfort of the arthritis.
(c) On April 25, 1962, the Correction Board again determined that no corrective action was indicated in plaintiff’s case.
V
13. (a) On July 18,1963, plaintiff filed her petition in this court alleging that she was 60 percent disabled at the time of her separation, wherefore she should have been retired at that time for physical disability.
(b) There is in evidence the deposition of Dr. Bowlin L. Lichter, a diplómate of the American Board of Orthopedic Surgery, practicing in Honolulu (where plaintiff lives), who *247 examined plaintiff in August 1965 and diagnosed her condition as rheumatoid arthritis. As was said of the testimony of Dr. Herzmark (in finding 10(b)), Dr. Lichter supported his opinion as one derived from the exercise of professional skill and judgment by a trained physician, well qualified to form and express an opinion. Dr. Lichter did not treat plaintiff. He found her condition, in relation to her hands particularly, to be in such remission as to be in no immediate need of treatment.
(c) Defendant presented the testimony of three physicians,[9] none of whom had either examined or treated plaintiff, but each of whom had examined her medical records (including X-rays) in minute detail, and each of whom concluded that the diagnosis of rheumatoid arthritis was not fully substantiated. One testified that he was convinced that plaintiff had never had rheumatoid arthritis.
VI

Summary

14. (a) The evidence warrants by inference the conclusion that plaintiff first received a diagnosis of rheumatoid arthritis in 1950, at Moses Lake, Washington, details of which are not in evidence. This diagnosis was not accepted by Dr. Russell of San Rafael, California, who treated her from 1950 to 1957[10] nor by Dr. Tormey, of Worcester, Massachusetts, who treated her from 1957 to 1961.[11] In the first of the Service Findings in evidence,[12] the examining physician reported that plaintiff was admitted to the hospital[13] “because of symptoms suggestive of rheumatoid arthritis for the past five years.”
(b) Subsequent Service Findings repeat the diagnosis of rheumatoid arthritis[14] while emphasizing the “generalized” nature of it and discounting the symptoms.[15]
*248 (c) The diagnoses of rheumatoid arthritis by Drs. Herz-mark[16] and Lichter,[17] who examined plaintiff but did not treat her, are to be balanced against the opinions of Drs. Russell[18] and Tormey[19] who had plaintiff under their care for treatment during a (combined) period of 11 years and who declined to confirm the diagnosis of rheumatoid arthritis.
(d) The weight of the medical testimony warrants the conclusion by a lay mind that plaintiff’s condition on July 31, 1960 (the date of her separation), was such that almost any trained physician, who might have been called upon to treat her (in addition to making a physical examination as the basis of diagnosis) would have, as treatment continued, checked and double checked her symptoms to determine whether her arthritic condition was atrophic (rheumatoid) or hypertrophic (osteo) or primarily one as compared to the other.
VII

Finding of Ultimate Fact

15» (a) The implicit finding by the Secretary of the Air Force that the diagnosis of atrophic arthritis was not fully substantiated was supported by substantial evidence.[20]
(b) The action by the Secretary in rating plaintiff’s disability under the diagnostic code 5002-5003 was therefore proper.
CONCLUSION OE Law
Upon the foregoing findings of fact and memorandum opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover, and the petition is dismissed.

 Hypertrophic arthritis, degenerative arthritis, and osteoarthritis are synonymous terms. Likewise, atrophic arthritis and rheumatoid arthritis, mentioned in section 5002, are synonymous. The type first mentioned is hereinafter generally referred to as osteoarthritis while the type last mentioned is generally designated as rheumatoid arthritis. Osteoarthritis and rheumatoid arthritis are distinctly different diseases.

 As indicated in finding 7(i), the action by the Secretary was based upon his approval of the findings and recommendation of the Physical Disability Appeal Board (set forth in finding 7(h)) that “* * * the diagnosis * * * is: Arthritis, atropic [sic], with multiple joint involvement, under diagnostic code numbers 5002-5003, with a disability rating of twenty (20) percent."

 In computing the 60-percent rating, the PUB recommended an award o 1 10 percent for each hand, each fcnee, each shoulder, and each foot.

 Contained in chapter 11 of AFM 35-4.

 It is to be noted that this PRC reduced the disability rating from 60 percent to 40 percent. Omitted from this rating "were the knees and the shoulders.

 Chapter 11 of the Air Force Manual, § 35-4, February 1, 1960, authorized this procedure and directed the PEB to make findings and recommendations and forward them to the PRC, Headquarters USAF, for consideration. The Manual contained the following provision for “Disposition of Member After Final Determination” : “upon the determination of the Secretary of the Air Force, one of the following actions will be taken :
“a. The member’s name will be retained on the Temporary Disability Retired List.
“b. The member will be permanently retired.
“c. The member will be separated.
“d. The member will be reappointed or reenlisted in his component.”

 In her testimony, plaintiff referred to symptoms principally in her hands and stated that she felt she could perform active duty if the Service would accept her limitations.

 Dr. Herzmark obtained bis A.B. and M.D. degrees from George Washington University, interned in three or four hospitals, studied abroad (surgery and pathology) and taught in the medical school at George Washington university before his specialization in orthopedic surgery. As part of that specialization he was resident physician in the New York Hospital for the Ruptured and the Crippled. In the Armed Porces during World War II, he was Chief of Orthopedics of Lloyd General Hospital and Chief of Surgery of a hospital in the South Pacific. He is a board-certified orthopedist, and has published an article distinguishing Reiter’s Disease from rheumatoid arthritis.

 Two were in the Air Force; the third was a Veterans Administration official.

 Finding 2(b).

 Finding 2(c)..

 Finding 3(a).

 On July 11, 195,7.

 Findings 3(c), 3(d), 5(c), 6(b), 7(b), 7(d), and S(c).

 Findings 5(b), 6(b), 7(b), and 8(b).

 Finding 10.

 Finding 13(b).

 Finding 2(b).

 Finding 2(c).

 Within the context of Beckham v. United States, supra, 179 Ct. Cl. at 543, 544, 375 F.2d at 785