James A. BECKHAM

v.

The UNITED STATES.

No. 379-61.

United States Court of Claims.

April 19, 1968.

See also 179 Ct.Cl. 539, 375 F.2d 782.

Paul R. Harmel, Washington, D. C., attorney of record, for plaintiff.

Arthur E. Fay, Washington, D. C., with whom was Asst. Atty. Gen. Edwin L. Weisl, Jr., for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

OPINION

DURFEE, Judge.

This is an action for disability retirement pay based upon provision of section 402 of the Career Compensation Act of 1949.[1] Plaintiff is claiming disability retirement pay from March 15, 1952 (date of final separation from the Navy) to the present on the ground that he incurred a service-connected disability during his first tour of duty (8/15/37 to 12/9/45) which was aggravated by his second tour of duty (10/28/50 to 3/15/52) to the extent that plaintiff was unfit for active duty within the meaning of the Act.

A brief statement of the facts[2] and procedural posture of the case is as follows:

Plaintiff spent two tours of duty in the Navy and in both instances the separation was voluntary. Upon both separations he was found physically fit for active duty. In neither instance did the terminal examination include a gastrointestinal (G.I.) X-ray series. Yet, plaintiff was granted a 20 percent disability rating by the Veterans Administration, effective as of November 30, 1949, for a duodenal ulcer which the VA expressly conceded was *service-connected*. In addition, when plaintiff entered the Navy for his second tour of duty (October, 1950), he was appointed with a waiver for a physical disability

1. 63 Stat. 802, 37 U.S.C. § 272 (1952) (now 10 U.S.C. § 1201 (1959)).

2. Since we accept our Commissioner's findings of fact with only slight modifications (although we do not accept his conclusion of law), it is not necessary to repeat that thorough recitation of facts here.

labeled as "gastritis, chronic and sequelae of".[3]

Then, in 1955 (subsequent to his *second* release from duty at which time he was again found physically fit), plaintiff was found not qualified for active duty pay status in the Navy Reserve because of his prior medical record of gastrointestinal ailments, and a recent medical examination (January, 1955) which found "peptic ulcer diathesis and duodenal ulcer". The record was shortly thereafter amended to reflect plaintiff's gastrectomy (July, 1955) in which 60 percent of his stomach and four inches of his intestines were removed. Although the operation was the culmination of plaintiff's history of gastroenterological ailments beginning some time during his first tour of duty, it reinforced the Navy's conclusion that plaintiff was unfit for active pay status in the Navy Reserve.

On January 23, 1959, plaintiff requested that his military records be changed to reflect the fact that he was unfit for active duty at the time of his second separation because of a service-connected disability (duodenal ulcer) and eligible for disability retirement pay pursuant to the provisions of the Career Compensation Act of 1949.

The Board for the Correction of Military Records, upon the advisory opinion of a Physical Evaluation Board (which was approved by the Physical Review Council), denied this request although neither the Physical Evaluation Board nor the Physical Review Council specified the standard upon which the determination of fitness of plaintiff was based. Plaintiff then brought suit in this court for disability retirement pay alleging that the decisions of the medical boards and the Navy Correction Board were arbitrary, erroneous in law, and not based upon substantial evidence.

The court rendered a decision (Beckham v. United States, 375 F.2d 782, 179

Ct.Cl. 539, pet. for cert. dismissed, 389 U.S. 1011, 88 S.Ct. 583, 19 L.Ed.2d 613 (1967)), and held essentially three things: (1) the Navy waiver statute (see fn. 2, supra) only applied to "civilian incurred" injuries; (2) the Navy's definition of "organic defect" is reasonable; and .(3) the Trial Commissioner should have allowed a trial for the introduction of new evidence.

Before trial, however, plaintff filed a motion requesting withdrawal of the remand to receive new evidence; and for determination of plaintiff's claim on the existing record. Over defendant's objection, an appropriate order of court, dated November 28, 1967, was entered, granting plaintiff's motion.

Thus, in the present posture of the case, there are now two questions before this court:

(1) Whether plaintiff had waived any rights to disability retirement pay he might have had, because he accepted an appointment for his second tour of duty which was granted "with a waiver"?

(2) Assuming the first question is answered in the negative, then, whether the Correction Board acted unlawfully, arbitrarily or without substantial evidence when it determined, in effect, that plaintiff was not entitled to disability retirement pay at the time of his separation from the Navy in 1952?

I

■ As pointed out above, we have already held in the first *Beckham* case, supra, that the applicable Navy waiver statute only applies to "civilian-incurred" disabilities. In other words, the statute does not take away an "officer's rights to benefits for an injury or disease initially incurred while on active duty". [Id. at p. 784]

■■ We now find on the basis of the evidence of record that plaintiff's disability or disease was service-incurred.[4] There is no Board finding to

3. The waiver was issued pursuant to provisions of the Act of December 18, 1942, 56 Stat. 1066. This Act was subsequently repealed by the Act of July 9, 1952, 66 Stat. 505.

4. See, findings of fact, 3–9, inclusive.

the contrary. Defendant tacitly concedes this point, but simply argues that this is not the real issue. The Veterans Administration has also found that plaintiff's disease was service-incurred. Its conclusion, when based on a medical examination as here, is entitled to great weight. Hutter v. United States, 345 F.2d 828, 831, 170 Ct.Cl. 517, 523 (1965).

Consequently, the first *Beckham* decision is controlling on the waiver issue, and we hold that plaintiff did not waive any rights upon accepting the appointment for his second tour of duty "with a waiver".

## II

With regard to the second issue, we also agree with plaintiff, and find that he was unfit for active duty and entitled to disability retirement pay within the meaning of the Career Compensation Act of 1949 at the time of his separation from the Navy in March of 1952. The Board's conclusion to the contrary is either based on an erroneous interpretation of the applicable statute and regulation or not supported by substantial evidence, or both.

Entitlement to disability retirement pay under the provisions of this Act requires, among other things, proof of a permanent [5] service-connected disability which renders the claimant unfit to perform the duties of his rank, grade or rating. In addition, it must be shown that such disability was incurred while claimant was on active duty.

To determine whether or not a member of the Armed Forces is entitled to disability retirement is the function of the Secretary of the particular service involved in the first instance, and this determination is entitled to finality. The mere fact that this court might disagree with the Secretary's determination in any given instance does not mean that we then have authority to overturn the Secretary's determination. See, e. g., Johnston v. United States, 157 Ct.Cl. 474, 475–476 (1962). But where there is a showing that the Board (acting for the Secretary) did act arbitrarily, capriciously, without support of substantial evidence or contrary to applicable statutes and regulations, this court has an obligation to entertain a claim for disability retirement pay. See, e. g., Cooper v. United States, 178 Ct.Cl. 277 (1967). Such is the situation in this case.

As a preliminary matter, we note with dismay that none of the Naval Boards [6] commented upon or even referred to the regulation of the Navy that established the standards by which fitness or unfitness for active Naval service was to be determined. They could well have decided the case as if they were not controlled by any legal standard of fitness, and as if determination of this fact was within their unlimited discretion. Needless to say, this is not the law; the Navy Board, like other administrative bodies, is bound by its own regulations. See, Hamlin v. United States, Ct.Cl. 391 F.2d 941, at p. 943, decided March 15, 1968, and cases cited therein.

Assuming, however, that the Correction Board did use the correct legal standard, there is no satisfactory showing on the record that the Board's determination was based upon a balanced consideration of all the evidence available and presented. A naked conclusion and mere recitation that the opinion is based upon all of the evidence without an analysis of the evidence in writing (as here),

5. Although the permanence of plaintiff's disability may not have been subject to conclusive proof at the time of separation, there is no doubt as to the permanence of the disability after the Subtotal Gastrectomy. In such case plaintiff should have been put on the temporary disability retired list (§ 402 of the Career Compensation Act of 1949, now 10 U.S.C. § 1202) up until the time of the operation, with a final determination of permanent disability made after the operation (pursuant to § 402 of the Act, 10 U.S.C. § 1210).

6. The Naval Correction Board, a Physical Evaluation Board and the Physical Review Council all concluded that plaintiff was "physicaly fit" on the date of his release from active duty.

is inimical to a rational system of administrative determination and ultimately inadequate. See, Smith v. United States, 168 Ct.Cl. 545, 553 (1964); cf., Loral Electronics Corp. v. United States, Ct.Cl., 387 F.2d 975, at p. 980, decided December 15, 1967: "In these circumstances [summary and sketchy findings and reasoning by the administrative Board] we cannot give as much deference to the Board's determination as if it had given detailed findings to support, and fuller explanations of the reason for, its conclusion. We are compelled to look to the record without much help from the Board's opinion, and therefore, without the need to accord as great weight to its determination as we otherwise would. Cf. Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 167–169, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)".

It is not necessary, however, to dwell unduly on these administrative deficiencies since we conclude that, if the correct legal standard is applied, and due weight is given to all the evidence of record, plaintiff must be found unfit for active service on the date of his release from active duty, March 15, 1952, and entitled to disability retirement pay. In deciding otherwise, the Correction Board must either have ignored the governing regulations, or acted upon unsubstantial evidence, or both.

▇▇▇ The Career Compensation Act of 1949, supra, requires, *inter alia,* proof of a permanent service-connected disability which renders the claimant "unfit to perform the duties of his rank, grade or rating". The then applicable regulation provided that the "specific rule for fitness for duty is ability to perform assigned duty". Manual of the Medical Dept., U.S. Navy (1951 ed.) Article 15–45(6).

This means that an officer must be able to perform any assigned duty which the normal, healthy officer can perform, although he need not be able to perform under extraordinary conditions. See, Harris v. United States, 177 Ct.Cl. 538 (1966). "The Naval standards * * * require * * * that he [Naval officer] be physically capable of performing those [duties] which he would normally be called upon to perform in such manner 'as to reasonably fulfill the purposes of his employment'". Id. at 552. In other words, the Navy cannot shift an officer from assignment to assignment until a job is located that is not affected by the officer's physical disability.

A related but independent facet of the disability standard involves the extent of time an officer is able to perform his assigned duty. Certainly, if a Naval officer can work only for two hours a day or perhaps only for two weeks at a time, he is not fit for active duty, even if his work during his productive periods is considered "satisfactory". Peformance, then, must be analyzed both qualitatively and quantitatively in order to determine whether such performance constitutes performance of "assigned duty" within the meaning of the Navy Manual, supra.

The crucial inquiry here is whether the degree of plaintiff's ailments rendered him unable to perform his assigned duty within the proper meaning of the statute and regulations. It is clear to us that, in 1952, plaintiff's gastric and duodenal ailments were of the type, and were sufficiently severe to require his retirement with disability pay.

In the first instance, plaintiff's infirmities were officially recognized by the Navy as enough for retirement, if present in adequate degree. A regulation on physical standards for entry into the Naval service indicated that several of plaintiff's specific gastroenterological ailments would each be cause for rejection of new applicants.[7] Although this

---

7. Manual of the Medical Dept., U.S. Navy (1951), 15–20: "(2) The following conditions are causes for rejection: * * * (f) Chronic diseases of the stomach or intestine or a history thereof, including such

diseases as peptic ulcer, regional ileitis, ulcerative colitis and diverticulitis".
Paragraph 2175 of the Manual of the Medical Dept., U.S. Navy (1945) provided that chronic diseases of the stomach

procurement standard does not apply in full force to the different issue of retention on active duty or retirement for physical disability (see, Towell v. United States, 150 Ct.Cl. 422, 434–436 (1960)), a Navy regulation does indicate that due regard should be given to the specific provisions of the procurement regulations for purposes of retention,[8] the difference being that the standards are not to be as strictly applied for retention as for appointment purposes. This same result, i. e., that one set of physical standards is used for both appointment and retention, but applied more stringently in the former, is effected by explicit regulation in the Army. See, e. g., Boraiko v. United States, 146 Ct.Cl. 814, 819–820 (1959).

This means, at the least, that abdominal infirmities of plaintiff's type would be the foundation for disability retirement if sufficiently severe. Plaintiff's case fits this measure. Upon a balanced view of the circumstances of this case, one must conclude that plaintiff's gastro-intestinal illness rendered him unable to perform in such manner and extent as to reasonably fulfill the purposes of his employment.

Plaintiff was called to active duty (for his second tour) as a Naval Reserve Officer on October 28, 1950 at his own request. He was assigned to three months' temporary duty in Sasebo, Japan. His duty there consisted of eight-hour watches at the communications crypto board. Although there is nothing extraordinary or hazardous about these duties, plaintiff's assumption of his duty station was marked with the onset of nervousness and tension which quickly increased in severity, and was eventually characterized by a resumption of symptoms of nausea, stomach pain, vomiting of blood (hematemesis) and blood in stools (me-

lena). As a consequence of his illness, plaintiff's duty in Japan was prematurely terminated (January 17, 1951) and he was returned tc the Commander, Service Force, Pacific Fleet, at Honolulu. A letter from plaintiff's Commanding Officer, explaining the premature termination, advised "that he [Beckham] not be sent to a ship or station where hospitalization is not immediately available". On January 23, 1951, plaintiff was sent to Tripler Hospital, Honolulu, for a gastro-intestinal examination. The medical record indicated that the duodenal bulb was deformed and noted further: "*Impression:* Probable chronic duodenal ulcer disease without demonstration of an active ulcer at this time". Plaintiff was placed on a restricted dietary schedule, and was directed to take medication consisting of Banthine four times daily, and Amphojel after each meal.

Plaintiff was returned to duty, this time, as Assistant Postal Officer of the Pacific. Among other duties, this new position required plaintiff to participate in an oral presentation program two to three times per week. Again, the assignment was not extraordinary or especially hazardous. The oral presentations were designed to acquaint visiting high-ranking officials with the functioning of the Service Force. At these presentations, plaintiff always delivered his presentation last, since he was a lieutenant, whereas the other six participants were all captains. It is apparent from his testimony before the Physical Evaluation Board that plaintiff suffered unduly from nervousness and tension during these meetings. The symptoms which had prematurely terminated his tour of duty in Japan reappeared, and again plagued plaintiff, e. g., nausea, stomach pain and vomiting of blood. Once again plaintiff's assigned duty was interrupt-

---

or intestines, a gastroenterostomy or blood in the feces unless shown to be due to unimportant causes, were disqualifying for enlistment or appointment.

Paragraph 15–7 of the Manual of the Medical Dept., U.S. Navy (1952) listed as causes of rejection chronic gastritis, gastric resection; ulcer of the duodenum when diagnosis is confirmed by X-ray examination or authenticated history.

8. Manual (1951), supra, para. 15–2: "Purpose of physical standards * * * is to *procure and retain* personnel who are physically fit". [Emphasis supplied.]

ed, and once again he was sent to Tripler Hospital. The results of this examination, August 30, 1951, indicated that the duodenal bulb was "grossly deformed" and noted: *"Impressions:* Disease of the duodenal bulb. Ulcer is probably present although it was not demonstrated on this examination".

When plaintiff's active duty expired in March, 1952, he decided not to continue because, in his own words, "I had been suffering with my stomach so much, that I found that the best thing for me to do would be to terminate my active duty when my time was up".[9] (This decision was made in spite of plaintiff's obvious desire to remain in the Navy). Consequently, he was ordered to Treasure Island, San Francisco, for a physical examination for purposes of separation. At this time neither a G.I. X-ray series nor an examination of his ulcer was given. On the medical report under Item 73, "Significant or Internal History", there were no notations whatsoever by the examining doctors in spite of plaintiff's clear history of abdominal ailments. Yet, it was on the basis of this examination that plaintiff was separated from the Navy with a finding that plaintiff was physically fit for active duty. This finding was made in spite of the fact that during the short interval from October 1950 to March 1952, plaintiff had been assigned to two duty stations, and in both cases, the anxiety generated by these jobs caused him to suffer moderate to severe episodes with his ulcerated duodenum. It should be reiterated that the jobs to which plaintiff was assigned were not extrahazardous, but represented reasonable and ordinary jobs which make up the bulk of Naval duty assignments. It should also be pointed out that plaintiff's disability and consequent inability to withstand the pressure of his position and function normally for any length of time is abnormal for a healthy male of his age (33 years old). This is not a case like that presented in Johnston v. United States, supra, 157 Ct.Cl. at pp. 477–478, where the court stated: "While plaintiff suffered various maladies, the record does not require a conclusion that these afflictions effected, at the time of plaintiff's release, any significantly greater degree of debilitation than would pertain in most fifty-eight year old males performing similar duties".

It is important here to note further that a physical disability which renders an officer unfit for duty is not always manifest at the precise time of separation. Consequently, we must look to *manifestations of the disease or ailment* appearing both before and after the point in time of separation.

In Grubin v. United States, supra, for example, the court held that a claimant was entitled to disability retirement for gastro-intestinal ailments even though the disease (ulcerative colitis) was quiescent at the time of separation. In Farrar v. United States, 358 F.2d 965, 173 Ct.Cl. 1008 (1965), the court also held that plaintiff was entitled to recover disability pay even though claimant's disability (a disc injury) was not correctly diagnosed until well after he was separated. The officer's symptoms at the time of separation (and for some time thereafter) were wrongly attributed to other causes believed to be temporary or not disabling. The court found, however, that the officer was actually disabled at the time of release.

This is the same situation as in the case at bar. Although plaintiff was found to be physically fit at the time of separation, subsequent events prove that the disease was still there. Perhaps plaintiff himself was not aware at that time of the extent of his disability.

Plaintiff here, as in *Grubin,* supra, expected that upon return to civilian life

---

9. The fact that plaintiff chose to separate voluntarily does not lessen the Government's obligation to pay disability retirement if plaintiff actually had an incapacitating disease at the time of separation. See, Grubin v. United States, 333 F.2d 861, 166 Ct.Cl. 272 (1964).

he could contain the ulcer. In both cases, however, such hopeful expectations were not fulfilled. Plaintiff Beckham attempted to bring his ulcer under control by maintaining a strict diet, continuing to take medication, and by retiring to the relatively tranquil life of a rural mail-carrier on a 4½-hour-per-day job. In spite of these efforts, plaintiff's symptoms not only did not abate, but actually grew worse. The continued existence of plaintiff's duodenal ulcer was corroborated by a VA gastro-intestinal examination on August 21, 1952, and again by a private examination in October, 1953. The X-ray report of the radiologist (part of the latter examination) stated:

> * * * There is a persistent clover leaf deformity of the duodenal bulb and in the base of the bulb just distal to the pylorus there is a crater measuring eight millimeters in diameter. This crater is surrounded by radiating mucosal folds.

On the basis of this latter examination, plaintiff's private physician, Dr. Riddell, recommended a stomach resection. Plaintiff, however, desired that further attempts be made to heal the ulcer medically. For approximately two years thereafter, plaintiff adhered to a treatment of banthine, during which time he experienced frequent and continuous flare-ups of his ulcer. On April 11, 1955, the Bureau of Medicine and Surgery, responding to plaintiff's request for attachment to a pay unit in the Naval Reserve, indicated the following physical impairments: "peptic ulcer diathesis, duodenal ulcer". On July 6, 1955, because of increasingly severe symptoms,[10] plaintiff underwent surgery for the removal of a duodenal and a peptic ulcer. This gastric resection required the removal of 60 percent of his stomach and four inches of his intestine.

On the basis of this subtotal gastrectomy, plaintiff was rated 40 percent disabled by the Veterans Administration.

 In sum, this record adds up to convincing proof that plaintiff had a permanent case of an ulcerative duodenum as well as attendant difficulties in a sufficiently serious form that he was permanently disabled on that account, and that he was not able to perform the assigned duties of his rank at the time of separation from active duty in 1952. In deciding otherwise, the Correction Board must either have ignored or misinterpreted the governing regulations and statute, or acted upon unsubstantial evidence, or both. On the basis of the evidence before us, we are justified in setting its determination aside as unwarranted.

We hold that plaintiff is entitled to disability retirement pay from March 15, 1952 to the present time, and judgment is entered to that effect. The percent of disability (30 percent or more), and the amount of recovery will be determined pursuant to Rule 47(c) (2).

---

10. For example, on June 29, 1955, plaintiff was admitted to a hospital after experiencing an acute attack of a week's duration, during which time he was not able to retain any food.