Per Curiam :
This case was referred to Trial Commissioner Harry E. Wood with directions to make findings of fact and recommendation for conclusion of law under the order of reference and Rule 57(a) [since September 1, 1969, Rule 134(h)]. The commissioner has done so in an opinion and report filed on April 7,1969. Exceptions to the commissioner’s opinion, findings and recommended conclusion of law were filed by defendant. Plaintiff requested the court to adopt the opinion, findings and recommended conclusion of law of the commissioner. The case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court agrees with the commissioner’s opinion, findings and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Therefore, plaintiff is entitled to recover disability retirement pay computed on the basis of 30 percent disability which “may be” permanent, for the period May 28, 1960, to May 27, 1965, and on the basis of 50 percent disability from May 28,1965, less YA compensation paid to plaintiff following May 28, 1960, and judgment is entered for plaintiff accordingly with the amount of recovery to be determined in further proceedings pursuant to Rule 131 (c).
OPINION OF COMMISSIONER
Wood, Commissioner: Plaintiff sues to recover disability retirement pay on the ground that, at the time of his separation from the Air Force May 27, 1960, for unsuitability, he was unfit for military service by reason of physical disability. In Russell v. United States, 183 Ct. Cl. 802 (1968), the court held that plaintiff’s separation for unsuitability was invalid; that the defense of no initial determination by the Secretary of the Air Force, or Ms designee, as to plaintiff’s *593 fitness or unfitness for duty and entitlement to disability retirement pay was not jurisdictional; and that the defense had been waived by defendant in this case. The case was remanded to the trial commissioner for determination whether plaintiff was unfit for military service on May 27, 1960, and, if so, the extent of his disability.
Following remand, defendant conceded that plaintiff was unfit for military service by reason of physical disability at the time of his separation from the Air Force, and the parties agreed that supplementation of the record on the question of plaintiff’s percentage of disability was unnecessary. The case has therefore been considered on the prior record.
On the basis of the findings of fact, and ultimate findings and conclusions, set forth below, it is concluded that plaintiff is entitled to recover (1) for the period May 28, 1960, to May 27, 1965, disability retirement pay computed on the basis of 30 percent disability, which “may be” permanent, and (2) from and after May 28, 1965, disability retirement pay computed on the basis of 50 percent disability, less VA compensation paid to plaintiff from and after May 28, 1960.
FINDINGS of Fact
I
1. Plaintiff contends that at the time of his separation from the Air Force on May 27, 1960, he was unfit for military duty by reason of physical disability (schizophrenic reaction), 100 percent disabling, which “may be of a permanent nature”;[1] that “a continuous rating of 100 per cent” thereafter is “just, fair and reasonable”; and that he is therefore entitled (1) for the period May 28, 1960, to May 27, 1965,[2] to temporary disability retirement pay at the rate *594 of 75 percent of the basic pay of a staff sergeant with over 13 years’ service, and (2) from and after May 28, 1965, to permanent disability retirement pay so computed, less disability compensation paid to him by the VA after May 28, 1960.[3]
Defendant contends that plaintiff’s physical disability (which defendant terms anxiety reaction) was less than 30 percent on May 27, 1960;[4] that the disability was then “of a permanent nature”;[5] and that plaintiff may therefore recover only disability severance pay or permanent disability retirement pay determined as of May 27,1960. Alternatively, assuming plaintiff’s physical disability on May 27, 1960, “may be of a permanent nature” and 30 per cent or more,[6] defendant contends that his recovery should not in any event exceed 50 percent of the basic pay of a staff sergeant with his years of service for basic pay purposes.
2. In Bussell v. United States, supra, the court held that plaintiff’s separation from the Air Force May 27, 1960, for unsuitability was invalid, and that, although ordinarily the Secretary of the Air Force or his designee should make the initial determination of plaintiff’s unfitness and entitlement to disability retirement pay, the defense that such a determination had not been made by a proper board was not jurisdictional and had been waived by defendant in this case. The case was remanded to the trial commissioner for determination whether plaintiff was unfit for military service at the time of his separation from the Air Force, and, if so, the extent of his disability.
*595 3. Following remand defendant has conceded that plaintiff was unfit for military service by reason of physical disability at the time of his separation from the Air Force.[7]
II
4. Plaintiff, a citizen of the United States and a resident of North Carolina, was born January 16,1930, in High Point, North Carolina.
5. Plaintiff enlisted in the United States Army on January 22, 1947, and served in that capacity until January 11, 1950, when he was honorably discharged for the convenience of the government. During his enlistment period plaintiff was integrated into the United States Air Force (USAF) at the time of the establishment of the Department of he Air Force. Plaintiff enlisted in the USAF Reserve on January 31, 1950. He was called to active duty on November 12, 1950, and honorably discharged on November 11, 1951 (release from active duty). Plaintiff reenlisted in the USAF on December 5, 1951, and served until December 4, 1955. During this latter period of service he served overseas in Korea and was awarded the Korean Service Medal with two Battle Stars. Plaintiff reenlisted in the USAF on February 6,1956, and served until he was honorably discharged on May 27, 1960, by reason of unsuitability.
6. From March 1, 1957, to May 27, 1960, plaintiff served in the grade of staff sergeant. Plaintiff lost no time from duty during his military career due to disciplinary action. At the time of his discharge plaintiff was assigned to the 58th Fighter Interceptor Squadron, Air Defense Command, Walker Air Force Base, New Mexico. His enlistment was not due to expire until February 5, 1962.
7. At the time of his discharge plaintiff had completed a total of 12 years, 3 months and 11 days of active military service, including more than five years of overseas service. His overseas service consisted of duty in Okinawa from January 1948 to June 1949; Korea from July 1952 to July 1953; and Germany from September 1956 to August 1959.
*596 8. During plaintiff’s initial period of enlistment from January 1947 to January 1950, Ms primary duty assignment was that of an ammunitions helper. He also served in that capacity and as a weapons specialist during his period of service in the Reserve. During his tours of duty from December 1951 to December 1955, and from February 1956 to May 1960, plaintiff served as a munitions specialist, except for the period from approximately October 1959 to March 1960 when he served as a munitions technician. Plaintiff’s duties as a munitions specialist were set forth in the Airman Classification Manual, Air Force Manual 35-1, dated December 1, 1959, as follows:
Assembles, maintains, stores, grades, reconditions, handles, and destroys explosives, incendiary and toxic munitions, warheads, and solid propellant rockets; handles and assists in loading conventional and nuclear munitions and guided air missiles; decontaminates areas and equipment exposed to toxic and radioactive materials.
9. During plaintiff’s period of service from January 22, 1947, to January 11, 1950, all of his character and efficiency ratings were “excellent.” No character or efficiency ratings were recorded during plaintiff’s active duty from November 12, 1950, to November 11, 1951. Plaintiff was promoted from private first class to corporal on February 1, 1951. During the period of active duty from December 5, 1951, to December 4, 1955, plaintiff’s character and efficiency were rated “excellent.” He was promoted from private first class to airman second class on June 1, 1952, and from airman second class to airman first class on April 1, 1954. One Airman Performance Report (APR) was made during that period of service describing plaintiff’s overall evaluation as “Very Good” and he was recommended for promotion. Plaintiff reenlisted in the USAF on February 6,1956, in the grade of airman first class. For the period February 6, 1956, to September 24, 1956, wMle assigned to duty at Hamilton AFB, plaintiff’s character and efficiency were rated as “excellent.” He was promoted to staff sergeant on March 1, 1957. An APR rendered for the period March 31, 1957, to March 31, 1958, rated plaintiff as a “Very Good Airman” *597 and it was recommended that he be promoted along with other airmen of similar service and experience.[8] Plaintiff’s unit commander recommended plaintiff for the Good Conduct Medal. Plaintiff’s APE for the period April 1,1958, to March 31, 1960, rated him a “Very Good Airman,” and he was recommended for promotion along with airmen of similar service and experience. The report stated:
STRENGTHS: SSgt. Eussell is a conscientious worker and has an extensive knowledge of his job specialty in the munitions career field. He readily accepts those responsibilities assigned to him and in their discharge produces acceptable results with an absolute minimum of supervision.
recommended improvement areas: Due to a nervous condition it is recommended that Sgt. Eussell be Siven medical aid to help combat his nervousness. ubject NCO should be given every opportunity to supervise personnel so as to enhance his supervisory potentialities.
PACTS AND SPECIPIG ACHIEVEMENTS: Sgt. EuSSell ÍS inclined at times to moodiness due to a nervous condition. He has on numerous occasions worked long hours after duty which has tremendously helped this squadron’s combat effectiveness.
suggested assignments: Eecommend subject NCO be crossed trained [sic] into a career field commensurate with his physical condition.
On April 6, 1960, plaintiff was again recommended for the Good Conduct Medal. That medal, with three loops, was awarded plaintiff during his active military service.
III
10. Based upon medical examinations conducted for purposes of enlistment, discharge, or extended active duty on January 21, 1947; January 10, 1950.; November 14, 1950; October 31, 1951; December 5,1951; November 21,1955; and February 6, 1956, plaintiff was found to be “physically qualified.”[9]
*598 11. From August 7 to 16, 1947, plaintiff was hospitalized for “nervousness.” His previous personal history indicated he had been nervous for many years. Despite the nervousness, plaintiff had been performing his work in a satisfactory manner. He was diagnosed as having a mild anxiety manifested externally by tremulousness of about 5 years’ duration. The final diagnosis was: “Anxiety reaction, mild, chronic.” His physical profile was recorded as 1-1-1-1-1-2.
12. From March 7 to 12, 1952, plaintiff was hospitalized because he was “nervous, upset, shaking — since teens, worse now.” The final diagnosis was “Anxiety reaction” in line of duty.
13. There is no indication in the record that, between March 13,1952, and February 23,1956, plaintiff complained of, or received any medical treatment for, any psychiatric problem.[10] On February 23, 1956, plaintiff was examined for “stomach trouble” and was observed to be “nervous.” On March 8, 1956, plaintiff was examined for “pain scalp-vertex” and on July 10, 1956, when being examined for the same ailment, he appeared “very nervous” and was given medication. On April 15, 1957, plaintiff complained of pain in the lower abdomen; he was hospitalized for observation, and discharged to duty on April 17, 1957.
14. On January 24, 1958, plaintiff was seen on an outpatient basis at which time he was reported “extremely anxious.” The stomach symptoms he complained of were attributed to emotional upset. Plaintiff was given a prescription for meprobamate.[11]
15. On August 11, 1958, because plaintiff was “extremely nervous” and intermittently on meprobamate for six months, the 7425th TTSAF Hospital in Germany where plaintiff had been treated on an outpatient basis requested a psychiatric evaluation. It was noted plaintiff had already been twice hospitalized for “nerves” and he was concerned about his stomach, was “very apprehensive” and “tremulous.” A pro *599 visional diagnosis of “Chronic Anxiety Reaction” was recorded.
16. On August 29, 1958, a consultation report was made by Captain Eobert E. Froelich indicating that plaintiff was very tense, with a tendency toward rambling, paranoid ideation and marked suspiciousness. The diagnosis was:
SCHIZOPHRENIC reaction, paranoid type, chronic, moderate, manifested by difficulty in interpersonal relationships, restlessness and some anxiety.
Stress: minimal, Predisp: marked, Impairment: moderate.
ld: Undet.
Plaintiff was scheduled to be admitted to the hospital September 2, 1958, for further evaluation. Dr. Froelich was not a psychiatrist, and his special training in the area of psychiatry consisted of a 4-month course.
17. Between September 2-11, 1958, plaintiff was hospitalized at the USAF Hospital at Wiesbaden, Germany. The diagnosis of the attending physician. Captain David A. Turner, was:
emotional instability reaction, chronic, moderate, manifested by excitability, explosiveness, emotional lability, moderate anxiety and trends toward paranoid ideation.
* * * * *
Impairment was classed as moderate. The condition, in the physician’s opinion, was not incurred in the line of duty, having existed prior to plaintiff’s entry into the service. The record does not reflect the degree of training Captain Turner had in psychiatry.
18. On September 11,1958, plaintiff was returned to duty. Sparine[12] 100 mg four times a day was prescribed and plaintiff was given a month’s supply of that drug. Plaintiff was also given refill presciiptions of Sparine, 100 to a refill, on October 20, 1958; November 7, 1958; and November 21, 1958. On December 4, 1958, plaintiff was given a refill prescription of Sparine No. 200. On February 25,1959, plaintiff was given the “more readily available” Meprobamate No. 120. On June 16, 1959, he was returned to Sparine, 100 mg, *600 q.i.d. This prescription was refilled June 30, 1959. On July 24, 1959, plaintiff was given a refill of Sparine “0/050 No. 80” to be taken four times a day.
19. On January 26, 1960, the administrative officer of plaintiff’s unit requested, without specifying reasons, that plaintiff be given a psychiatric examination.
20. On February 12, 19.60, Captain David R. Rubin, USAF, USAF Hospital, Walker Air Force Base, New Mexico, prepared a “Narrative Summary” (Standard Form 502) concerning plaintiff. Dr. Rubin, who interviewed plaintiff as an outpatient, noted that plaintiff was “extremely suspicious”; taking into consideration previous diagnoses of plaintiff “as a psychotic and also as a character and be-haviour disorder,” Dr. Rubin “strongly recommended that [plaintiff] be removed immediately from any critical position.” Dr. Rubin concurred with the 1958 diagnosis (finding 17, supra) of “Emotional instability reaction, chronic, moderate, manifested by excitability, explosiveness, emotional lability, moderate anxiety, and [trends toward] paranoid ideation. * * *.” The record does not show how many times Dr. Rubin saw plaintiff before making the evaluation. Dr. Rubin had had approximately six months’ training in psychiatry, but was not a psychiatrist. Psychiatric cases on the base were referred to him because he was the one physician at the USAF Hospital interested in that field.
21. By letter dated April 15, 1960, plaintiff was notified that he was being considered for discharge, under honorable conditions, under the provisions of Air Force Regulation 39-16, “Enlisted Personnel — Discharge for Unsuitability.” The “Reasons for this action” were :
a. You are presently working out of your AFSC and further training or cross training is impractical as indicated in your medical and psychiatric examination.
b. You have a long Medical History of extreme anxiety, emotional instability, and schizophrenic reaction and it has been determined that you are unsuitable for further military service.
Plaintiff was advised that counsel had been appointed to assist him in the contemplated discharge proceedings, and that in lieu of appointed counsel he might have military *601 counsel of his own choice (provided “requested counsel is serving in the active military service and is reasonably available”) , or civilian counsel (at plaintiff’s own expense). Plaintiff was also apprised of his rights (1) to appear in person before a board of officers, and (2) to submit statements in his own behalf.
22. On April 25,1960, plaintiff underwent medical examination (“Purpose of Examination AFE 39-16”), at Walker Air Force Base Hospital. In connection with this examination, plaintiff completed a “Report of Medical History” (Standard Form 89) also reflecting as its purpose “39-16.” On Standard Form 89, plaintiff described his “Present health” as “Nervous and certain mental conditions, otherwise good”; among other things, he answered affirmatively questions whether he had ever had “frequent or severe headache”; “stomach, liver or intestinal trouble”; “depression or excessive worry”; and “nervous trouble of any sort.” The “Eeport of Medical Examination” (Standard Form 88), dated April 25, 1960, and prepared by Captain E. M. Bradley,[13] reflects an “Essentially negative physical examination under the provisions of AFE 39-16 or 39-17 separation”; that there were “No indications for separation under the provisions of AFM 35-1”; that plaintiff was qualified for general military service; and that his physical profile was “l-l-l-l-l-l.”
23. In an undated letter, plaintiff and his military counsel requested a hearing before a board of officers. On May 1, 1960, in a document not endorsed by his counsel, plaintiff waived a hearing before a board of officers. In another document, also dated May 1, 1960, and signed by both plaintiff and his counsel, plaintiff waived a hearing before a board of officers and stated that “I am not submitting any statements in my behalf.” On May 2, 1960, plaintiff’s unit commander requested that plaintiff be processed for discharge under the provisions of AFE 39-16, stating that “Under the facts as outlined in attached SF#502 * * *, it is my opinion that [plaintiff] is unsuitable for further military service.”[14] On *602 May 26, 1960, the request was approved, and plaintiff’s discharge under AFR, 39-16 with an honorable discharge was directed. By Special Orders No. A-525, May 26,1960, plaintiff was honorably discharged from the Air Force effective May 27,1960.
IV
24. On October 10,1960, plaintiff applied to the Air Force Discharge Review Board (AFDRB) “To Be Re-enlisted in the Grade of S/Sgt in the USAF or receive financial compensation.” Attached to plaintiff’s application was a statement, dated October 3,1960, from Kenneth H. Epple, M.D., a psychiatrist, of Greensboro, North Carolina. Dr. Epple had examined plaintiff August 15, 22, and 29,1960, at plaintiff’s request, so that plaintiff might submit Dr. Epple’s psychiatric evaluation to the “proper governmental authorities in order that he might return to active duty in the Air Force.” Dr. Epple’s conclusions were based on information derived from plaintiff and “the few Air Force documents which were personally directed to [plaintiff]”; plaintiff’s past medical records were unavailable to Dr. Epple at that time. Dr. Epple noted that he did not see plaintiff in his “natural environmental setting,” but expressed the opinion that plaintiff showed no evidence of schizophrenic reaction, extreme anxiety, or emotional instability. He recommended that plaintiff “be given most serious consideration in his application for reenlistment.” On November 30,1960, the AFDRB concluded that plaintiff had been “properly discharged,” and denied his request for a waiver to permit reenlistment. Plaintiff was advised of the action of the AFDRB by letter dated December 6,1960.
25. By application dated September 20, 1962, plaintiff applied to the Veterans Administration (VA) for “compensation or pension.” On September 23, 1962, Dr. Epple again examined plaintiff and made the following diagnosis:
* * * 1. Anxiety reaction with depressive features. 2. Personality pattern disturbance — paranoid personality. In light of Mr. Russell’s inability to adjust to his life following discharge and his present symptomatol-ogy, I would favor inpatient psychiatric care at the Veterans Administration Hospital. * * *
*603 26. On November 26, 1962, plaintiff underwent a YA neuropsychiatric examination for “compensation” purposes. The report of examination reflects that, except for “rather unusual sensitiveness and suspiciousness,” plaintiff “does not express anything that can be taken as psychotic material,” and, “On the whole, * * * does not show the signs of a psychosis * * The examining physician offered a diagnosis of “Personality disorders: Personality pattern-disturbance: Emotionally unstable personality,” but proposed, should a more definitive diagnosis be deemed necessary, that plaintiff be returned for observation to a psychiatric inpatient situation.
27. In a “Rating Decision” of December 14, 1962, “For Hospitalization Or Outpatient Treatment Purposes,” the YA concluded that plaintiff’s “condition was aggravated by military service for hospitalization and treatment purposes.” In view of plaintiff’s “dire need of hospitalization for nervous disability,” service connection, by aggravation, for “anxiety reaction” was established to facilitate plaintiff’s admission to the YA Hospital.
28. Plaintiff was admitted to the YA Hospital, Durham, North Carolina, December 19, 1962. He remained a patient at this hospital, with intervening periods of leave, to December 26, 1963. An Interim Summary, dated March 6, 1963, reported an “established clinical diagnosis” of:
1. Psychoneurotic anxiety reaction, with passive dependent personality.
a. Predisposition: Unknown.
b. Precipitating stress: Unknown.
c. Degree of psychiatric impairment — at time of admission: Moderate to severe; at time of dictation: Moderate.
A “Final Summary,” dated January 8,1964, reflects a diagnosis at plaintiff’s discharge on December 26, 1963, of psy-choneurotic anxiety reaction with passive dependent personality, with psychiatric impairment moderate to severe at the time of admission, and “Improved” at the time of discharge.[15]
Footnote continued on following page.
*604 29. By VA Rating Decision dated May 13,1964, plaintiff’s VA disability rating was reduced effective January 1, 1964, to 10 percent for “Psychoneurotic Anxiety Reaction With Passive Dependent Personality, Moderate,” VA Diagnostic Code No. 9400.
30. On July 23,1964, plaintiff was hospitalized at the VA Hospital, Salisbury, North Carolina, with an admission diagnosis of “Depressive reaction.” He remained a patient at this hospital to November 3, 1964. On September 21, 1964, Dr. E. A. MacMillan, a psychiatrist, diagnosed plaintiff’s condition as:
(1) Anxiety reaction with depressive features. Stress: Undetermined. Predisposition: Passive dependent personality. Impairment: Severe.
Continued hospitalization was recommended. A “Final Summary,” dated November 13, 1964, states that “There was some suspicion that [plaintiff] was a paranoid schizophrenic, but psychological studies ruled this out,” and reflects a diagnosis of “Anxiety reaction, with depressive features, moderate.”
31. By “Rating Decision” dated December 9, 1964, the VA rated plaintiff, reporting “Anxiety reaction with depressive features,” ratable at 10 percent from January 1, 1964, to July 22, 1964; 100 percent from July 23, 1964, to November 30, 1964;[16] and 10 percent from December 1,1964, under VA Diagnostic Code No. 9400. Notice of disagreement, filed for plaintiff December 30,1964, by the North Carolina Veterans Commission, ultimately resulted in an increase in plaintiff’s disability rating, effective December 1, 1964, to 50 percent.
32. Plaintiff was readmitted to the VA Hospital, Salisbury, North Carolina on March 22, 1965, with an admission diagnosis of anxiety reaction. He remained a patient at this hospital to June 24, 1966. In an “Interim Summary” dated
*605 December 16, 1965, Dr. MacMillan stated that plaintiff’s “present status * * * is very little different than it has been,” and made a diagnosis of anxiety reaction with depressive features, impairment severe.[17] In a Final Summary, dated July 5, 1966, Dr. James H. Hawkes, a psychiatrist, rendered a diagnosis of “Anxiety reaction with depressive and paranoid features, severe.” The final summary states in part:
* ‡ * Physical and neurological examinations are negative. Mentally, he shows deep-seated anxiety, .is tense, has a fine tremor of his extended fingers, and his voice is tremulous. He is depressed in mood, describes his situation as “frustrating”, and says he is not able to cope with life’s situations. He shows some paranoid thinking, feels that people are against him and are laughing at him. * * * denies hearing voices, is seclusive, does not have any friends, has no hobbies, and spends his time just sitting around brooding and thinking. He is well oriented. During this period of hospitalization, he has shown little essential change. Attempts have been made to obtain employment for him, but he remains indecisive, unable to cope with any really productive situation, and is lacking in the capacity to fend for himself. He is considered to be competent. The medical staff felt that prolonged hospitalization of this patient was detrimental to him and felt that he should be discharged and forced to accept an employment situation. He was accordingly discharged on 6/24/66 as having attained maximum benefit from hospitalization and was furnished medication consisting of Mellaril 100 mgm t.i.d. 'for a 14-day period.
33. By “Bating Decision” dated August 22,1966,[18] the VA rated plaintiff, reporting “anxiety reaction with depressive and paranoid features in a passive dependent personality,” ratable at 50 percent from December 1,1964 (see finding 31, supra), to March 21,1965; 100 percent from March 22,1965 (the date of plaintiff’s readmission to the VA Hospital), to June 30, 1966; and 50 percent from July 1, 1966, under VA Diagnostic Code No. 9400.
*606 v
34. (a) Under 10 U.S.C. §1201 (1958), and 10 U.S.C. §1201 (1964), the percentage of physical disability of a member of a regular component of the armed forces who has become physically unfit for duty by reason of physical disability is to be determined “under the standard schedule of rating disabilities in use by the Veterans’ Administration at the time of the determination * *
(b) As of May 27, 1960, the VA Schedule provided in part as follows:
GENERAL POLICY IN RATING
$ ‡ $
3. Resolution of Seasonable Doubt. — It is the defined and consistently applied policy of the Veterans Administration to administer the law under a broad interpretation, consistent, however, with the facts shown in every case. When after careful consideration of all procurable and assembled data, a reasonable doubt arises regarding * * * the degree of disability * * * such doubt will be resolved in favor of the claimant.
By reasonable doubt is meant one which exists by reason of the fact that the evidence does not satisfactorily prove or disprove the claim, yet a substantial doubt and one within the range of probability as_ (distinguished from pure speculation or remote possibility. It is not a means of reconciling actual conflict or a contradiction in the evidence; the claimant is required to submit evidence sufficient to justify a belief in a fair and impartial mind, that his claim is well grounded. Mere suspicion or doubt as to the truth of any statements submitted, as distinguished from impeachment or contradiction by evidence or known facts, is not a justifiable basis for denying the application of the reasonable doubt doctrine if the entire, complete, record otherwise warrants invoking this doctrine. The reasonable doubt doctrine is also applicable even in the absence of official records, particularly if the basic incident allegedly arose under combat, or similarly strenuous conditions and is consistent with the probable results of such known hardships.
H* # * ❖ He
7. Higher of Two Eatings. — If there is a reasonable doubt, as above defined, as to which of two ratings shall *607 be applied in any given case, the claimant is entitled to the higher.
‡ ‡ ‡ ‡
(c) Effective December 1, 1963, the VA Schedule was amended by, inter alia, deletion of the above definition of “reasonable doubt” and by revising paragraph 7 to read as follows:
Where there is a question as to which of two evaluations shall be applied, the higher evaluation will be assigned if the disability picture more nearly approximates the criteria required for that rating. Otherwise, the lower rating will be assigned.
35. (a) As of May 27,1960, the VA Schedule provided in pertinent part as follows:
PSYCHIATRIC CONDITIONS
& $ $ $ $
The Psychoneurosis (sic)
# }Jc ij: # ‡
9101 Neurasthenia Mating
Pronounced; with persistent insomnia, neuromuscular asthenia, emaciation, gastro-intestinal atony; with instability, inability to concentrate; depression; in symptom combinations that are persistent and continuous; such as to produce nearly complete social and industrial inadaptability_ 80
Severe; characteristic findings in marked and persistent form with definite compatible physical asthenia, i.e., loss of weight, circulatory disturbance, vasomotor changes, tremors, objectively substantiated; productive of severe social and industrial inadapt-ability _ 50
Moderately severe; characteristic mental and physical fatigability unrelated to disease process or toxic agents, with fairly frequent headaches not due to toxemia, uncorreeted visual defect, etc., fairly frequent prolonged periods of insomnia, or objectively ascertained vasomotor instability, approximating neurocirculatory asthenia with decided reduction in exercise tolerance; productive of considerable social and industrial inadaptability_ 80
Moderate _ 10
Mild _ 0
*608 9103 Psychasthenia (specify type) Bating
Pronounced.; with irresolution amounting to abulia, or severe anxiety reaction associated with almost all daily activities; consistent deterioration of the general health, persistent and continuous; in symptom combinations that are persistent, continuous, and productive of nearly complete social and industrial inadaptability- 80
Severe; with characteristic indecision, and severe phobias, obsessions, compulsions, or anxiety reaction association with several important or common situations; productive of severe social and industrial inadaptability_ 50
Moderately severe; with persistent phobias, obsessions, or compulsions, fairly numerous and materially circumscribing activity, producing fairly constant moderate anxiety reaction or perhaps occasional severe situation anxiety episodes; productive of considerable social and industrial inadaptability— 30
Moderate _ 10
Mild _ 0
9104 Anxiety hysteria
Bate as psychasthenia, substituting psychological reactions of fear, anxiety, etc., for phobias, obsessions, or compulsions.
9105 Anxiety state
Bate as neurasthenia
* * * * *
(b) Effective October 1, 1961, the YA Schedule was revised in pertinent part as follows:
MENTAL DISORDERS
$ $ $ $ ‡
Psychoneurotic Disorders
9400 Anxiety reaction
9401 Dissociative reaction
9402 Conversion reaction
9403 ¿Phobic reaction
9404 Obsessive compulsive reaction
9405 Depressive reaction
9406 Psychoneurotic reaction, other
*609 General Eating Formula for Psyehoneurotie Disorders:
The attitudes of all contacts except the most intimate are so adversely affected' as to result in virtual isolation in the community. Totally incapacitating psycho-neurotic symptoms bordering on gross repudiation of reality with disturbed thought or behavioral processes associated with almost all daily activities such as phantasy, confusion, panic and explosions of aggressive energy resulting in profound retreat from mature behavior. Demonstrably unable to obtain or retain employment__ 100
Ability to establish and maintain effective or favorable relationships with people is seriously impaired. The psyehoneurotie symptoms are of such severity and persistence that there is pronounced impairment in the ability to obtain or retain employment_ 70
Ability to establish or maintain effective or favorable relationships with people is substantially impaired. By reason of psyehoneurotie symptoms the reliability, flexibility and efficiency levels are so reduced as to result in severe industrial impairment_ 50
Definite impairment in the ability to establish or maintain effective and wholesome relationships with people. The psyehoneurotie symptoms result in such reduction in initiative, flexibility, efficiency and reliability levels as to produce considerable industrial impairment _ 30
Less than above, with emotional tension or other evidence of anxiety productive of moderate social and industrial impairment_ 10
There are neurotic symptoms which may somewhat adversely affect relationships with others but which do not cause impairment of working ability_ 0
* * *
36. Chapter 1, section A, paragraph 1, Air Force Manual 35-4 “Physical Evaluation for Retention, Retirement and Separation,” February 1, 1960, provides in pertinent part as follows:
Disability of Permanent Natwre. If it is medically ascertained that a member’s combined percentage of disability, computed by the application of the veterans Administration schedule of rating disabilities, may not with reasonable expectation change by a ratable amount within the 5-year statutory period, or if the combined *610 percentage is 80 percent or more and may not with, reasonable expectation later reduce below 80 percent, the disability should be considered permanent.
Disability Whioh May Be of Permanent Nature. If it is medically ascertained that a member’s combined percentage of disability computed by the application of the Veterans Administration schedule of rating disabilities may with reasonable expectation change by a ratable amount within the 5-year statutory period, the disability may be permanent.
These provisions were in force, without substantive change, throughout the period May 1960, to and after May 1965.
VI
37. At the trial sessions held in this case on February 15, May 19 and 27, and July 21, 1966, four medical witnesses testified.
(a) Dr. E. A. MacMillan, a psychiatrist at the VA Hospital, Salisbury, North Carolina, from 1953 to the date of trial, and chief of one of the three psychiatric units at the Hospital, testified for plaintiff on February 15,1966. He first saw plaintiff on July 23,1964. His first impression of plaintiff was that “this is probably an early case of schizophrenic reaction, paranoid type,” but he subsequently concluded that plaintiff’s condition was a psychoneurotic, and not a psychotic, one. Dr. MacMillan had diagnosed plaintiff’s condition in May and December 1965, as anxiety reaction with depressive features, impairment severe[19] (finding 32, supra), but at trial expressed the “feeling” that plaintiff “is headed toward * * * a schizophrenic reaction.” Dr. MacMillan had “very little” experience in the use of the VA Schedule for Rating Disabilities, and could not testify “with any authority” as to plaintiff’s percentage of disability. When asked to characterize plaintiff’s social and industrial inadaptability as “complete, severe, considerable, definite, or slight,” he answered “I would say sevére.” [20] He testified that plaintiff’s *611 condition, as it “relates to his capacity to earn a living * * * is quite severe”; that plaintiff “is very, very severely handicapped by this illness”; and that “his release from some sort of custodial surroundings is unlikely.” He also testified that plaintiff’s condition “seems to be a continuing process since” 1958 at least, and that the condition was “worse” at the time of trial than in May 1960.
(b)- Dr. James H. Hawkes, chief of one of the psychiatric units at the YA hospital, Salisbury, North Carolina, and a YA physician since 1940, also testified for plaintiff oh February 15, 1966. Plaintiff had been on his service since January 19, 1966, He concurred with “Dr. MacMillan’s summation of the case and all his statements, essentially * * He had not reviewed plaintiff’s military medical records; and “it is pretty hard for me to say what [plaintiff’s] condition was in 1960.”
(c) Defendant’s witness, Colonel Paul M. Grissom, TJSAF, Chief of the Psychiatric Service, USAF Hospital, Andrews Air Force Base, Maryland, testified on May 19 and 27, 1966. Dr. Grissom was awarded certification by the American Board of Psychiatry and Neurology in 1962. He had had extensive experience in examining military personnel psy-chiatrieally in connection with disability discharges, and had served as a medical member of physical evaluation boards. He did not personally examine plaintiff.
Dr. Grissom’s diagnosis of plaintiff’s condition, as of 1960, was “emotionally unstable personality of the passive dependent type.” He testified that plaintiff’s condition had steadily worsened following May 27,1960. In his opinion, a diagnosis of schizophrenic reaction was not supported. Dr. Grissom disagreed with the YA’s diagnosis of anxiety reaction with depressive features, stating that within the Air Force anxiety reaction is considered a mental disease and a cause for medical separation, but that plaintiff suffered from a character and behavior disorder for which medical separation was not warranted. His diagnosis was a “eharacterologic descriptive” one for a condition, which, if severe enough, would lead to administrative separation from the Air Force.[21]
*612 (d) Dr. Eugene E. Inwood of Chevy Chase, Maryland, a psychiatrist, testified for plaintiff on July 21, 1966. Dr. In-wood is certified by the American Board of Psychiatry and Neurology. After brief VA employment in 1937, he served as a Eegular Army medical officer from 1937 to his retirement from the Army in 1954. From January 1948 to July 1952 he was Chief of Psychiatry at Walter Eeed Hospital, and from July 1952 to July 1954 he served at the Walter Eeed Army Institute of Eesearch. Since 1954 he has been engaged in private practice. Dr. Inwood has been on the staff of Georgetown University since 1948 and now holds the position of Professor of Psychiatry. Since 1954, he has been a consultant ait Walter Eeed Hospital and for the Federal Aviation Agency. Since 1960, he has been “the principal investigator” of a contract relating to the Air Force human reliability program.
Dr. Inwood had reviewed prior testimony and exhibits in this case. He had also examined plaintiff, and had had a psychological examination of him made on July 8,1966. Dr. In-wood expressed the opinion that plaintiff was “mentally disabled” in May 1960; that his condition was not a character and behavior disorder; that he had a “seriously disabling amount of anxiety right now”; that it was the “same kind of anxiety” plaintiff had had prior to and during military service; that at some point in his early life, plaintiff had had “some bouts with schizophrenia”; that his anxiety was the kind a psychotic in partial remission shows; that plaintiff had “some kind of psychosis which fits pretty closely to the schizophrenic picture”; that his diagnosis was “schizophrenic reaction, other” ;[22] and that plaintiff’s condition was incurred in line of duty “by aggravation if nothing else.”[23]
In Dr. Inwood’s opinion, plaintiff was not fit for military service in May 1960, but was not “as bad then as he is now.” *613 He testified that plaintiff’s condition “is permanent now,” and, viewed in retrospect, was permanent, bnt that “at the time, I probably would have been a little hopeful and said well let’s put the man on the TDRL and see how he gets along.” He described plaintiff’s condition, in terms of the VA Schedule, as “somewhere more than severe at the present time” (July 1966). He testified that plaintiff “would have to be considered to have considerable impairment of social and industrial adaptability at the time of his discharge.” In Dr. Inwood’s opinion, Dr. Epple’s 1960 report concerning plaintiff (finding 24, supra) was “obviously in error.”[24]
Ultimate Findings and Conclusions
38. The evidence does not establish that plaintiff suffered in 1960, or has suffered thereafter, from psychosis in general or schizophrenic reaction in particular. On the record, his unfitting physical disability as of May 27, 1960, and thereafter is best described as a psychoneurotic, rather than a psychotic, condition. Plaintiff’s medical records do reflect suspicion, from time to time, that he was a paranoid schizophrenic, but there is no credible diagnosis of this condition. Dr. Mac-Millan, who diagnosed plaintiff’s condition in 1964 and 1965 as anxiety reaction with depressive features, testified in 1966 to a “feeling” that plaintiff “is headed toward” a schizophrenic reaction, but this seems indicative of the absence, rather than the presence, of a psychosis. Dr. Inwood’s opinion that plaintiff’s condition is “schizophrenic reaction, other” is not persuasive, in light of the whole record.
39. The record warrants the conclusion that plaintiff’s physical disability, viewed as of May 27, 1960, “May Be of Permanent Nature” (see AFM 35-4, quoted in finding 36, supra). While plaintiff’s condition was then of long standing, and was likely to (and did) persist, the record indicates that his combined percentage of disability could “with reasonable expectation change by a ratable amount within the 5-year statutory period * * *” (finding 36, supra), and that it did in fact change by a ratable amount within the 1960- *614 1965 period. Nothing in the record establishes, or even suggests, that from a medical standpoint plaintiff’s “combined percentage of disability [as of May 1960] * * * may not with reasonable expectation change by a ratable amount within the 5-year statutory period * *
40. From a consideration of the record, including plaintiff’s medical records from 1958 to 1960 (findings 14-20, supra); his 1958 and 1960 APR’s (finding 9, supra); Dr. Inwood’s persuasive and uncontradicted testimony concerning plaintiff’s degree of disability in May 1960 (finding 37(d) supra); and the provisions of the VA Schedule in force in 1960 (findings 84 (b), 35 (a), supra), it is found that plaintiff’s psychoneurotic condition was then “productive of considerable social and industrial inadaptability,” 30 percent disabling. This conclusion is buttressed by the abrupt and involuntary termination, after 12 years of unblemished active service, of plaintiff’s Air Force career because of a supposed character and behavior disorder. In light of the total record, the VA rating of 10 percent awarded plaintiff, effective January 1,1964, and in force to July 22,1964, did not adequately reflect his true degree of disability then or theretofore.[25]
41. Following May 27, 1960, plaintiff’s psychoneurotic condition has persisted and progressed. The medical witnesses at trial unanimously agreed that plaintiff’s condition was worse in 1966 than it had been in 1960.
42. From a consideration of the record, including plaintiff’s history and medical records from 1960 to 1965 (findings 24-26,28, 30, 32, supra); the VA’s determinations that, effective December 1,1964, and again upon his release from hospitalization in June 1966, plaintiff was 50 percent disabled (findings 31, 33, supra); and the provisions of the VA Schedule in force in 1965 (findings 34(c), 35(b), supra), it is found that in May 1965 plaintiff’s psychoneurotic condition was 50 percent disabling under the VA Schedule.
Plaintiff notes that he was hospitalized from March 1965 to June 1966, and that, under paragraph 29 of the VA Sched *615 ule, Ms rating during hospitalization was 100. percent. Plaintiff’s argument is that the duration, nature and severity of his disability, and not simply the paragraph 29 rating in effect in May 1965, justify a finding of 100 percent disability as of May 1965. The 100 percent rating during hospitalization was assigned “without rega/rd to the provisions of the rating schedule * * *” (finding 28, supra; emphasis supplied). Viewing plaintiff’s psychoneurosis with regard to the provisions of the VA Schedule, a disability rating of more than 50 percent in May 1965 is not supported by the record.
43. While plaintiff’s psychoneurotic condition may have antedated his entry into the service (finding 11, supra), and may have been incurred “in line of duty” by aggravation (finding 27, supra), there is nothing in the record to justify any reduction in plaintiff’s disability ratings for pre-existing disability.
CONCLUSION OK LAW
Upon the foregoing findings of fact and conclusions of law, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover disability retirement pay computed on the basis of 30 percent disability, which “may be” permanent, for the period May 28, 1960, to May 27, 1965, and on the basis of 50 percent disability from May 28, 1965, less VA compensation paid to plaintiff following May 28, 1960, and judgment is entered to that effect. The amount of recovery will be determined in further proceedings pursuant to Rule 131(c).

 10 U.S.C. § 1202 (1958).

 A member of tie Air Force entitled to disability retirement pay “but for the fact that his disability is not determined to be of a permanent nature * * *” shall, If his disability “may be of a permanent nature,” be placed on the Temporary Disability Retired List (TDRL). 10 U.S.C. § 1202 (1958). While on TDRL retired pay is not less than 50 percent of the appropriate monthly basic pay. 10 U.S.C. § 1401 (1958). Periodic reevaluation while on TDRL is required. 10 U.S.C. § 1210 (1958) ; see Debs v. United States, 184 Ct. Cl. 229, 236 (1968). Absent an earlier disposition, final determination of the case must be made “* * * upon the expiration of five years after the date when the member’s name was placed on” TDRL. 10 U.S.C. § 1210 (1958).

 The case in its present posture relates only to the issues of law and fact relating to plaintiff’s right to recover, with determination of the amount of recovery, if any, reserved for further proceedings.

 A member of the Air Force with plaintiff’s service whose disability is less than 30 percent, whether it “is or may be of a permanent nature,” “may be separated « * * with severance pay * * 10 U.S.C. §1203 (1958).

 10 U.S.C. § 1201 (1958).

 There is no contention here that resolution of these factual questions is precluded, and that plaintiff’s rights, if any, must be measured solely by the situation extant at the time of his separation from the Air Force on May 27, 1960. Cf. Beckham v. United States, 183 Ct. Cl. 628, 635 fn, 392 F. 2d 619, 622 (1968) ; but cf. Cooper v. United States, 178 Ct. Cl. 277, 317 (1967) ; McGiven v. United States, 183 Ct. Cl. 920, 938 (1968).

 In remanding the case the court gave the trial commissioner leave to supplement the record, if necessary, with respect to the issue of the extent of plaintiff’s disability. The parties have agreed, however, that supplementation of the record on the question of plaintiff’s percentage of disability is unnecessary.

 The reporting official commented that plaintiff had been performing his duties to the best of his ability, and “always succeeds in difficult circumstances,” but noted that he “is sometimes unable to control his personal emotions * *

 Medical examinations of February 12, 1960, and April 25, 1960, are treated in findings 20 and 22, infra.

 During this period, plaintiff did receive medical treatment, on an outpatient basis, for a variety of ailments: a sprained ankle, insect bites, abrasions, diarrhea, common colds, sore throat, shoulder pains, chest pains, and the like.

 Meprobamate is a tranquilizing medication. The prescription was refilled on four occasions between January 24, 1958, and August 11, 1958.

 Sparine is also a tranquilizing medication.

 Captain Bradley was not a psychiatrist.-

 Plaintiff says that the reference to “SF#502” (see finding 20, supra) was in error, and that the unit commander meant to cite Standard Form 88, Report of Medical Examination of April 25, 1960 (see finding 22; supra). In light of the unit commander’s stated opinion, plaintiff’s assertion seems unsound, but decision on this point is unnecessary.

 A “Rating Decision” rendered in April 1963, during plaintiff’s hospitalization, reflects “Evidence insufficient to evaluate from 10-12-62 to 12-18-62” and a rating of “100% from 12-19-62 (Par. 29)” for psychoneurotic anxiety *604 reaction with passive dependent personality disorder, VA Diagnostic Code No. 9400. Tinder Paragraph 29, VA Schedule for Rating Disabilities (1957 Bd.) (VA Schedule), as amended effective March 1, 1963, a total disability rating (100 percent) “will be assigned without regard to the provisions of the rating schedule * * *” when, inter aUa, a service-connected disability requires hospital treatment in a VA Hospital for a period in excess of 21 days.

 The 100 percent rating referred to “Par. 29.”

 In an “Admission Report” dated May 3, 1965, the same diagnosis and degree of impairment were recorded.

 This decision was rendered after the taking of oral testimony in this case.

 While this term “denotes something very specific” for VA rating purposes, Dr. MacMillan would not agree that it “would be the basis for * » * determination of the degree of percentage of disability * * He testified that he did not “go into any percentages at all.”

 Dr. MacMillan’s testimony on this point, as it frequently did elsewhere, reflected post-1960 conditions as he saw them.

 Defendant’s concession that plaintiff was physically nnfit for military service by reason of physical disability in May 1960 (finding 3, supra), considerably undermines Dr. Grissom’s 1966 “diagnosis.”

 According to Dr. Inwood, “The only logical explanation is that this man had a psychosis of some kind. There isn't any history of a depression. So the only thing I am left with is that it had to be some sort of schizophrenic reaction * Cf. findings 25, 30, 32, 37(a), supra.

 When asked how plaintiff had been able to serve in the Air Force for over 12 years with a psychosis, Dr. Inwood testified in substance that schizophrenia is a condition characterized by exacerbations and remissions, and that, following plaintiff’s initial attack at about age 14, “He stayed in remission for a long time and got along fairly well."

 Dr. In-wood candidly admitted that any doctor is “bound to want to help” a patient, and that “maybe” he was “extending things a bit to help this man Russell.”

 VA “findings are not binding on this court, but its determinations of the degree of disability may well be persuasive.” Cooper v. United States, 178 Ct. Cl. 277, 289 (1967). This determination is not. The VA’s 1963 evaluation of plaintiff’s condition as “Improved” (finding 28, supra) was unfortunately inaccurate.